JORGE L. GARIB BAZAIN y OTROS, demandantes y recurridos, *v.* ENRIQUE CLAVELL y OTROS, demandados y recurrentes.

*Número:* RE-90-398    *Resuelto:* 18 de marzo de 1994

---

*Demetrio Fernández*, abogado de la parte demandada y recurrente.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

*Hechos*

Los demandantes, Dr. Jorge L. Garib Bazán (doctor Garib) y Dra. Carmen M. Gurrea Rosas (doctora Gurrea), quienes están casados entre sí y constituyen una sociedad legal de gananciales, son doctores en medicina y ejercen dicha profesión en Puerto Rico. El doctor Garib es especialista en enfermedades infecciosas y se ha distinguido en dicha rama de la medicina, habiendo participado en un sinnúmero de foros sobre estas enfermedades y sobre el Síndrome de Inmunodeficiencia Adquirida (S.I.D.A.). En el 1986 publicó junto a su esposa, la doctora Gurrea, un libro titulado *Aids, lo que todos debemos saber.* En dicho libro se discute, entre otros aspectos, las causas del S.I.D.A., las distintas manifestaciones fisiológicas de la enfermedad, sus aspectos psicológicos, la relación entre las distintas prácticas sexuales y la adquisición del virus, guías para aminorar las posibilidades de adquirir el virus, guías para grupos de personas que están expuestas al virus y los asuntos legales a los que se debe enfrentar una persona a quien se le diagnostica el S.I.D.A.

El demandado Enrique Clavell (Clavell) y su esposa operan una hospedería vegetariana y una tienda de productos naturistas. Clavell es, además, Director y Jefe de Redacción de la revista Salud Natural, Expresiones de Salud y Medicina Naturales (Salud Natural), la cual se publica cada (2) dos meses y se vende en todo Puerto Rico y en varios países del extranjero. Dicha revista promueve la filosofía de la salud natural, o naturismo. Cada ejemplar, de treinta y cinco (35) páginas aproximadamente, contiene un editorial y varios artículos que, entre otros temas, versan sobre nuevos descubrimientos en la medicina natural, las contribuciones de distintos individuos (médicos, profesores, naturistas) al campo de la medicina natural, la cura

de distintas enfermedades, incluyendo el S.I.D.A., mediante la medicina natural y una dieta vegetariana y críticas al método utilizado por la medicina tradicional y a sus resultados.

En dos publicaciones de la referida revista (Núm. 47 de enero-febrero de 1987 y Núm. 48 de marzo-abril de 1987) Clavell escribió dos artículos sobre el doctor Garib. En la revista Núm. 47, el artículo titulado *Retamos al Dr. Jorge Garib, especialista en no curar el A.I.D.S.* comienza con una introducción en la que el autor acepta el hecho de que él y la revista son controversiales porque el prestigio de sus "oponentes" (refiriéndose en parte a los médicos que ejercen la medicina tradicional) está en juego. Además, explica que se expresa con seguridad y verticalidad, ya que se fundamenta en su filosofía, la cual "se infiere de nuestras posiciones en los asuntos que exponemos y de las experiencias naturistas, propias y ajenas, que publicamos para beneficio de nuestros lectores y también de ... los médicos que no buscan en su profesión más que el lucro económico". Clavell, *Retamos al Dr. Jorge Garib, especialista en no curar el A.I.D.S.*, IV−47 Salud Natural: Expresiones de Salud y Medicina Naturales 47-6 (1987). En el próximo párrafo el autor expresa que el doctor Garib está contra "nosotros" (entiéndase el naturismo y la revista), a consecuencia de la crítica que éstos hicieron de su libro sobre el S.I.D.A. Íd. Procede entonces a opinar sobre el hecho de que la medicina debe ser para curar y no para desalentar a los pacientes enviándolos a la funeraria y al notario, y recomendándoles que mueran con dignidad. Por último, critica fuertemente las tarifas que cobra el doctor Garib y, a manera de reto, le propone que le refiera a uno de sus pacientes de S.I.D.A. para someterlo a tratamientos naturistas, asegurándole que éste se curaría.

En el siguiente ejemplar de la revista (Núm. 48 de marzo-abril de 1987), Clavell escribió una secuela al artículo anterior, titulado *Nuevo Reto al Dr. Garib*. El autor procede

a expresar que el doctor no sabe curar el S.I.D.A. ni diagnosticarlo con seguridad. Además, critica el hecho de que le enviara una carta a sus compañeros médicos en la que expresa que él es el más que sabe sobre el S.I.D.A., por lo que deben referirle los pacientes con dicha enfermedad. El autor vuelve a criticar la recomendación que el doctor Garib hace a sus pacientes referente a hacer testamento y planificar los arreglos fúnebres de antemano y las tarifas que cobra por sus servicios. Finalmente, Clavell ataca el método utilizado por el doctor porque aconseja a sus pacientes que coman lo que quieran, repitiendo el reto hecho en el ejemplar anterior. En esta ocasión, ofrece que de no curarse el paciente que Garib refiriera a Clavell, le regalaría mil dólares ($1,000).

El 13 de abril de 1987 el doctor Garib, la doctora Gurrea y la sociedad legal de gananciales compuesta por ambos presentaron una demanda contra Clavell, su esposa, denominada Jane Doe, y la sociedad legal de gananaciales compuesta por ellos.[1] Los demandantes alegaron, fundamentalmente, que en varias fechas los demandados hicieron ataques libelosos y calumniosos maliciosamente, por radio[2] y por escrito, contra los demandantes, a consecuencia de lo cual se vio perjudicada la venta del libro publicado por ellos así como sus vidas profesionales y personales. Solicitaron veinte mil dólares ($20,000) para la sociedad legal de gananciales y doscientos cincuenta mil dólares ($250,000) por la indignación y las angustias sufridas.

---

[1] Además, se incluyó como codemandada a María Martínez, Richard Roe, y la sociedad legal de gananciales compuesta por ellos, y John Wade Inc. Del récord ante nos no surge qué ocurrió con estos otros codemandados. La sentencia del tribunal a quo solamente se dirige a Clavell "y su esposa" como demandados en las determinaciones de hecho.

[2] Ni de la sentencia recurrida ni del récord ante nos surgen las fechas en que se hicieron las expresiones radiales. Tampoco surge el contenido de dichas expresiones. A pesar de que la sentencia de forma conclusoria incluye como una determinación de hecho que "también los programas radiales por los cuales el demandado Clavell lanzó los ataques difamatorios contra los demandantes tiene difusión a nivel de toda la isla de Puerto Rico", cada una de las expresiones catalogadas como difamatorias en dicha sentencia surge de las dos (2) revistas en cuestión.

El tribunal de instancia dictó sentencia el 18 de abril de 1990. Concluyó que los demandantes eran personas privadas a los fines de la doctrina de difamación, expresando que el doctor Garib

> ... es conocido en el campo de la medicina principalmente en relación con la enfermedad del S.I.D.A. Sin embargo, no tiene tal notoriedad y prominencia en la vida puertorriqueña que lo convierta en una figura pública. Aunque su opinión es a veces citada en los medios de comunicación, el Dr. Garib no se ha lanzado a la palestra pública con el propósito de lograr que un punto de vista prevalezca sobre otro en el curso de los acontecimientos públicos.

Además, el tribunal concluyó que, aun asumiendo que el doctor Garib fuera una figura pública, a los fines de la doctrina

> ... la información se publicó a sabiendas de que era falsa o con grave menosprecio de si era falsa o no. Se trata de publicaciones maliciosas dirigidas a causar daño sobre las personas de los demandantes. No se trata de una publicación de hechos correctos en forma neutral sobre un asunto de interés público. Consideramos que es libeloso *per se* señalar a un médico en el ejercicio de su profesión como un embaucador comparable a personas convictas de delitos relacionados con manejos ilegales de dinero.

El tribunal de instancia determinó que solamente se lograron probar los daños emocionales, concediéndoles diez mil dólares ($10,000) a cada codemandante por este concepto, más costas, y dos mil dólares ($2,000) por honorarios de abogado. Inconformes, los demandados recurren ante nos alegando error en la apreciación de la prueba. Argumentan, en síntesis, que la prueba admitida y no controvertida demuestra que los demandantes son figuras públicas, así como la ausencia del elemento de malicia real que es necesario probar en toda acción de difamación donde la entidad alegadamente difamada es figura pública.[3] Decidimos revisar y expedimos el recurso.

---

[3] El primer error dispone como sigue:

## Discusión

■ Para que prospere una acción civil por libelo o difamación se requiere probar: (1) la falsedad de la información publicada; (2) los daños reales sufridos a causa de dicha publicación; (3) si el demandante es una figura privada, hay que demostrar que las expresiones fueron hechas negligentemente, y (4) si el demandante es una figura pública, en vez, hay que demostrar que las expresiones se hicieron con malicia real, es decir, a sabiendas de que era falso o con grave menosprecio de si era falso o no. *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867 (1992); *Maldonado y Negrón v. Marrero y Blanco*, 121 D.P.R. 705, 715 (1988); *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 61–62 (1988); *Soc. de Gananciales v. López*, 116 D.P.R. 112, 115 (1985); *Oliveras v. Paniagua Diez*, 115 D.P.R. 257, 262 (1984); *García Cruz v. El Mundo, Inc.*, 108 D.P.R. 174, 180 (1978); *Zequeira Blanco v. El Mundo, Inc.*, 106 D.P.R. 432, 435 (1977).

■ Hemos señalado los rasgos siguientes peculiares de la figura pública: "1) especial prominencia en los asuntos de la sociedad, 2) capacidad para ejercer influencia y persuasión en la discusión de asuntos de interés público y 3) participación activa en la discusión de controversias públicas específicas con el propósito de inclinar la balanza en

---

"Cometió grave error de derecho la sala sentenciadora al determinar que la parte demandante era figura privada contrario a la prueba admitida no controvertida y a las normas de derecho aplicables y al soslayar los requisitos de la prueba de malicia real y los daños reales; violentando así el balance más racional, justiciero y jurídico [de] las determinaciones de hecho, por no sostenerse y ser insuficientes para concluir, como cuestión de derecho, la procedencia de una acción de libelo cuando no se han cumplido las normas legales establecidas por la doctrina jurisprudencial."

Además, se alegaron los errores siguientes:

"SEGUNDO ERROR: Cometió grave error de derecho la sala sentenciadora al concederle a los demandantes daños emocionales cuando no se probaron, son excesivos e improcedentes.

"TERCER ERROR: Cometió grave error de derecho el tribunal sentenciador al imponerle honorarios por temeridad a la parte recurrente."

Por la conclusión a la que llegamos bajo el primer error, no es necesario discutir los restantes.

la resolución de las cuestiones envueltas." *Torres Silva v. El Mundo, Inc.*, 106 D.P.R. 415, 422 (1977). Al determinar si una persona es figura privada o pública, hemos considerado como "eje crítico" la importancia e interés público del asunto o de la controversia de que se trate. *Ocasio v. Alcalde Mun. de Maunabo*, supra, pág. 62 (citando a *Zequeira Blanco v. El Mundo, Inc.*, supra). En *Pueblo v. Olivero Rodríguez*, 112 D.P.R. 369, 375 (1982), al utilizar el interés público involucrado como método evaluativo para decidir si el demandante cualificaba como figura pública o privada, expresamos:

> ... la noción de figura pública está estrechamente vinculada —por razón de la posición oficial, poder o envolvimiento en los asuntos públicos— a la adquisición de relieve, prominencia, fama o notoriedad especial o general en la comunidad que, como corolario, de modo significativo le permite de ordinario a una persona cierto acceso a los medios efectivos de comunicación para exponer, adelantar y debatir sus puntos de vista ante la opinión pública, y como resultado corre el riesgo de estar más expuesta al escrutinio, atención e interés público en contraste con un ciudadano privado.

El contexto en que se da la controversia tiene mucha relevancia cuando se va a decidir si al demandante le aplica el requisito de malicia real. Se debe considerar "la naturaleza de la declaración alegadamente difamatoria, el auditorio a que se dirige, los intereses que se sirven.o vulneran y la relación funcional entre estos factores". *Soc. de Gananciales v. López*, supra, pág. 117.

    Catalogar a un demandante como "figura pública" significa "que para prevalecer en un pleito de difamación se le someterá a un criterio más riguroso de prueba, que su derecho a la intimidad pesa menos que el derecho de otros a la libre expresión, a menos que demuestre la existencia en éstos de malicia real". *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685, 692–693 (1984). El concepto de "figura pública" no necesariamente se limita a los líderes y a otras personas destacadas de la sociedad. Cualquier ciudadano

privado puede cualificar como tal si adquiere el grado de notoriedad necesaria. Íd., pág. 693. El tribunal puede tomar conocimiento judicial de quién es figura pública. Íd., pág. 694.

■ El requisito de malicia real aplica tanto cuando la expresión del demandante está cobijada bajo el derecho a la libertad de prensa, como cuando está cobijada bajo el derecho a la libre expresión. A esos efectos, hemos expresado lo siguiente:

> El reconocimiento de unos derechos a la prensa inexorablemente conlleva extender iguales derechos y privilegios a la ciudadanía en particular vía la cláusula sobre libertad de expresión .... "Lo que se debe proteger no es la *institución* en sí, sino la *labor* de la prensa: viabilizar un vehículo de información y opinión, informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o desean compilarla. Una garantía especial de la libertad de prensa deberá aplicar no solamente a aquellos que la corte podía clasificar como "prensa" sino a quienquiera, de cualquier tamaño, y cualquier medio, que regularmente asuma la misión de prensa." (Énfasis en el original.) *Oliveras v. Paniagua Diez*, supra, pág. 268.

■ Es necesario probar la malicia real mediante una prueba clara y convincente. Tiene que surgir de hechos específicos. No es suficiente afirmar meramente que la publicación fue maliciosa. *Clavell v. El Vocero de P.R.*, supra, pág. 696; *García Cruz v. El Mundo, Inc.*, supra, págs. 180 y 183. La malicia real nunca se puede presumir. Al menos, hay que probar que el demandado tuvo serias dudas sobre la certeza de la información. *Soc. de Gananciales v. López*, supra, pág. 115; *García Cruz v. El Mundo, Inc.*, supra, págs. 180–181. "Es imprescindible que el demandado 'en efecto abrigue serias dudas sobre la certeza de la publicación'.... Se ha resuelto que aun prueba de mala voluntad u odio no satisface de por sí el grado constitucional-

mente requerido de la prueba de malicia." *García Cruz v. El Mundo, Inc.,* supra, pág. 181. Además, el "grave menosprecio" a que se refiere la doctrina " 'no se mide por lo que un hombre razonablemente prudente hubiese publicado o hubiese investigado antes de la publicación.' Tiene que existir 'prueba suficiente que permita concluir que el demandado abrigaba serias dudas sobre la certeza de la información' ". *García Cruz v. El Mundo, Inc.,* supra, pág. 181. La controversia sobre la suficiencia de la prueba para establecer la malicia real y quién es figura pública es una cuestión de derecho. *Oliveras v. Paniagua Diez,* supra, pág. 270; *García Cruz v. El Mundo, Inc.,* supra, pág. 183.

En cuanto a la extensión del derecho de libertad de expresión, se ha recalcado la importancia y necesidad del "debate robusto y abierto sobre la cosa pública, debate que ... 'bien puede incluir ataques vehementes, cáusticos y a veces desagradablemente cortantes ...' ". *Soc. de Gananciales v. López,* supra, pág. 115. Hemos rechazado anteriormente que la libertad de prensa, protegida a su vez mediante el requisito de malicia real, solamente cobije la publicación de informaciones correctas. "[L]as manifestaciones erróneas son inevitables en la discusión de los asuntos públicos. El propósito de la garantía constitucional es mantener un clima abierto para la discusión franca y vigorosa de los asuntos de interés público y de la conducta y ejecutoria de los funcionarios públicos. ... Por eso, la libertad de prensa incluye tanto la manifestación veraz como la incorrecta ...." *Zequeira Blanco v. El Mundo, Inc.,* supra, pág. 436. Véase, además, *Torres Silva v. El Mundo, Inc.,* supra, pág. 421.

Aún no hemos tenido la oportunidad de expresarnos sobre el *tipo* de expresión que está sujeta a una acción de difamación; especialmente cuando la falsedad es difícil, si no imposible de determinar. Recurrimos, por lo

tanto, a la casuística del Tribunal Supremo de Estados
Unidos a estos efectos.([4]) Dicho tribunal ha establecido lo
que se conoce como la regla de la *hipérbole retórica*, según
la cual una expresión alegadamente difamatoria no es ac-
cionable si se utiliza en sentido figurativo, flexible y no
necesariamente por su significado literal. En este sentido,
el tratadista Nimmer ha expresado lo siguiente:

> Al determinar si una expresión es de hecho falsa, a veces es
> necesario mirar más allá del significado literal de las palabras
> para establecer el mensaje comunicado. Si es manifiesto que el
> orador utiliza la hipérbole, entonces es necesario atemperar
> apropiadamente el sentido literal. Por ende, "el uso exagerado
> de la retórica" no le quitará a la expresión la protección de la
> Primera Enmienda, aunque en un sentido la expresión en-
> vuelva falsedad a sabiendas. Dicha hipérbole tiende a surgir en
> el área de la religión y las creencias políticas. El Tribunal Su-
> premo [federal] ha observado que en ambas áreas "los valores
> de una persona pueden parecer un error manifiesto a otra. Para
> persuadir a otros sobre su punto de vista, el orador, como sabe-
> mos, a veces recurre a la exageración, a la denigración de per-
> sonas que han sido, o son, prominentes en la Iglesia o Estado, y
> hasta a expresiones falsas. Pero los ciudadanos de esta nación
> han prescrito a la luz de la historia, que, no empece la proba-
> bilidad de excesos y abusos, estas libertades son, a largo plazo,
> esenciales para la opinión instruida y la buena conducta por
> parte de los ciudadanos de una democracia". (Traducción
> nuestra.) M. Nimmer, *Nimmer On Freedom of Speech: A Trea-
> tise on the Theory of First Amendment*, 1984, Sec. 3.03[B][4],
> págs. 3-24 a 3-25.

---

([4]) En Puerto Rico la fuente principal de protección contra las expresiones difa-
matorias es la Sec. 8 del Art. II de nuestra Constitución: "Toda persona tiene derecho
a la protección de ley contra ataques abusivos a su honra, a su reputación y a su vida
privada o familiar." L.P.R.A., Tomo 1, ed. 1982, pág. 292. Este derecho, puesto en
vigor mediante la acción de difamación, podría confligir con el derecho constitucional
de libertad de prensa y expresión reconocido, a su vez, en el Art. II, Sec. 4 de nuestra
Constitución, *supra*; por lo tanto, hay que hacer un balance de intereses al resolver
cada caso en particular. En cuanto a la dinámica entre nuestro derecho estatutario y
constitucional, *vis-à-vis* la Constitución de Estados Unidos de América en este
campo, hemos expresado una y otra vez que " 'la vigencia de nuestra Ley de Libelo y
Calumnia está condicionada, naturalmente, a que su aplicación no sea incompatible
con las antes citadas disposiciones de nuestra Constitución ... ni con las interpreta-
ciones judiciales [del Supremo federal acerca de la Primera Enmienda de la Consti-
tución de los Estados Unidos]' ". *Porto y Siurano v. Bentley P.R., Inc.*, 132 D.P.R. 331,
344 (1992).

En *Greenbelt Pub. Assn. v. Bresler*, 398 U.S. 6 (1970), el Tribunal Supremo de Estados Unidos adoptó la doctrina de la hipérbole retórica. En ese caso, un desarrollador estaba en el proceso de negociar una variación de zonificación con un consejo de la ciudad, y simultáneamente negociaba con dicha ciudad la venta de un terreno que la misma estaba interesada en adquirir. Un periódico publicó varios artículos, donde se describían las actuaciones del desarrollador como chantaje. El Tribunal desestimó la demanda de libelo incoada por el desarrollador, explicando que el uso de la palabra "chantaje" (*blackmail*) no se ·entendía como una aseveración de que el desarrollador, de hecho, había cometido chantaje. El Tribunal expresó: "La imposición de responsabilidad sobre tal base es constitucionalmente impermisible —como una cuestión de derecho constitucional, la palabra 'chantaje' en estas circunstancias no constituía libelo." (Traducción nuestra.) *Greenbelt Pub. Assn. v. Bresler*, supra, pág. 13. Además, el Tribunal consideró que "aun el lector menos cuidadoso tiene que haber percibido que la palabra no fue más que una hipérbole retórica, un epíteto vigoroso utilizado por los que consideran que la posición [del desarrollador] es sumamente irrazonable". (Traducción nuestra.) Íd., págs. 13–14.

Similarmente, en *Hustler Magazine v. Falwell*, 485 U.S. 46, 50 (1988), el Tribunal denegó la indemnización por una parodia que aparecía en un anuncio comercial, ya que no se podía razonablemente interpretar que dicha parodia expresaba hechos fácticos sobre el demandante. En *Letter Carriers v. Austin*, 418 U.S. 264, 284–286 (1974), el uso de la palabra "traidor" refiriéndose a un "rompehuelga" no se consideró difamatorio. La palabra se había utilizado de manera flexible, figurativa y era una expresión imaginativa que reflejaba el odio sentido por los miembros de la unión.

Igualmente, expresiones humorísticas han recibido especial protección bajo la Primera Enmienda de

la Constitución de Estados Unidos. El humor, sea en forma de sátira, parodia, chistes, etc., rinde una función dual al entretener y servir de crítica social simultáneamente. Como tal, amerita una protección especial en nuestra sociedad. Véase K.M. Fitzgerald, *Humor and the Law of Libel: Serious Protections for Attacks Made in Jest*, 40 Fed. Comm. L.J. 377–397 (1988). En Estados Unidos esta protección surge en gran medida del principio cardinal desarrollado a través del *common law*, que postula que una expresión no puede catalogarse como libelosa o difamatoria a menos que "se pueda entender razonablemente en un sentido difamatorio por las personas que la [escucharon o leyeron]". (Traducción nuestra.) Íd., pág. 378 (citando *Polygram Records, Inc. v. Superior Court (Rege)*, 170 Cal. App.3d 543, 554, 216 Cal. Reptr. 252, 259 (1985); *Restatement of the Law (Second) of Torts* Sec. 563 (1977)). Frecuentemente, si no siempre, una expresión humorística es falsa y así lo entiende la persona que hace la expresión. Así, los requisitos de falsedad y de malicia real están presentes técnicamente en este tipo de caso. Por ende, la imposición de responsabilidad dependerá usualmente del significado difamatorio que conlleve la expresión humorística. Véase Fiztgerald, *supra*, pág. 380 y ss. Es importante señalar que el Tribunal Supremo de Estados Unidos no ha establecido todavía una regla uniforme para determinar si una expresión humorística constituye difamación o libelo.(5) Sin embargo, la doctrina de la hipérbole retórica

---

(5) En *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), pudiendo establecer una norma a esos efectos, dicho Tribunal se abstuvo de así hacerlo. En ese caso, Falwell, un ministro y comentarista político muy conocido, demandó por libelo, entre otros fundamentos, debido a una caricatura que, satíricamente, simulaba ser parte de una promoción comercial de un licor. La caricatura en cuestión representaba al ministro describiendo su "primera experiencia" con el licor como un encuentro incestuoso con su madre en una letrina. La madre del ministro aparecía como una alcohólica promiscua y Falwell como un alcohólico hipócrita. El tribunal denegó la acción, basándose en los requisitos de falsedad y malicia real. Expresó que, por naturaleza, la sátira y la caricatura son ácidas y frecuentemente van dirigidas a herir los sentimientos del sujeto afectado. A pesar de esto, el tribunal reconoció que ambas formas literarias son un elemento muy importante y enriquecedor de la discusión pública y política. Íd., pág. 56.

establecida en *Greenbelt Pub. Assn. v. Bresler*, supra, ha sido empleada anteriormente para proteger este tipo de expresión. Fitzgerald, *supra*, pág. 387.

Al igual que la hipérbole retórica, la sátira y el lenguaje utilizado figurativamente, las *opiniones* son un tipo de expresión cuya certeza es muy difícil de precisar. A esos efectos, el Tribunal Supremo de Estados Unidos expresó, *via dictum*, en *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–340 (1974), lo siguiente:

> Bajo la Primera Enmienda no hay tal cosa como una idea falsa. Por más perniciosa que una opinión aparente ser, dependemos para su corrección no de la conciencia de los jueces y jurados, sino de la competencia de las ideas. Sin embargo, no hay valor constitucional alguno en las expresiones falsas de hechos. (Traducción nuestra.)

Posteriormente, en *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), el Tribunal rehusó establecer una "super" excepción para cualquier expresión que pudiera ser catalogada como opinión.[6] El Tribunal procedió a reiterar la doctrina imperante hasta ese momento en relación a la protección constitucional de distintos tipos de expresión, incluyendo la hipérbole retórica:

> ... *Hepps* asegura que una expresión de opinión relativa a cuestiones de interés público que no contenga una connotación fáctica que sea susceptible de ser probada como falsa, recibirá una protección constitucional total .... La línea de casos *Bresler-Letter Carriers-Falwell* protege las expresiones que no puedan ser "razonablemente interpretadas como que expresan hechos reales" (*actual facts*) sobre un individuo (citas omitidas.) Esto asegura que el debate público no sufrirá por falta de "expresión imaginativa" o de la "hipérbole retórica" que tradicionalmente

---

[6] Los hechos en *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), fueron los siguientes: Un entrenador de lucha libre de una escuela superior y el superintendente del distrito escolar al cual pertenecía el entrenador testificaron en una vista relativa a una pelea que surgió en una competencia. Subsiguientemente, un periódico publicó un artículo expresando, entre otras cosas, que "cualquiera que hubiera asistido a la competencia de lucha libre ... sabe de corazón que [el entrenador y el superintendente] mintieron en la vista".

ha aportado tanto al discurso de nuestra Nación. (Traducción nuestra.) *Milkovich v. Lorain Journal Co.*, supra, pág. 20.

Aunque el Tribunal en esa ocasión rehusó establecer una dicotomía tajante entre lo que constituye una opinión *vis-à-vis* un hecho, el tribunal señaló unos parámetros a esos efectos, delineando la cuestión dispositiva de la manera siguiente:

> ... [s]i un juzgador de hechos razonable podría concluir que las expresiones en [el periódico] implican una aseveración de que el [demandante] cometió perjurio en un procedimiento judicial. (Traducción nuestra.) *Milkovich v. Lorain Journal Co.*, supra, pág. 21.

El Tribunal concluyó que la connotación fáctica sobre la comisión de perjurio surgía del artículo, ya que el " 'claro impacto en nueve oraciones y el título es que [el demandante] 'mintió en la vista luego ... de haber prestado su juramento' " (traducción nuestra) y que, por lo tanto, las expresiones eran accionables. A esos efectos, tomó en cuenta que *no se trataba de lenguaje "flexible ["loose"], figurado o hiperbólico*, lo que descartaría la impresión de que el autor estaba aseverando seriamente que el demandante cometió el delito de perjurio". (Traducción nuestra.) Tampoco el tono general del artículo daba esta impresión. "... [L]a connotación de que el demandante cometió perjurio era *suficientemente fáctica para ser probada como cierta o falsa*. Una determinación sobre la veracidad de la comisión del perjurio podía hacerse sobre una *base de evidencia objetiva [i.e.,* comparando testimonios]" y no era, al contrario, una aseveración subjetiva. (Traducción nuestra.) Íd., pág. 21.

Consideramos prudente que al interpretar las disposiciones de nuestra Constitución que establecen el derecho a la protección contra ataques abusivos a la honra, reputación y vida privada o familiar, al igual que el derecho a la libertad de expresión y prensa, Art. Secs. 8 y 4 de

la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, incorporemos a nuestro ordenamiento jurídico las doctrinas de la hipérbole retórica y de la opinión.

Veamos la aplicación de estas normas de derecho a la reclamación del doctor Garib.(7)

El tribunal de instancia en su sentencia hizo referencia expresa a las siguientes expresiones contenidas en las dos publicaciones de la revista Salud Natural como constitutivas de difamación. Para facilitar la discusión que sigue, enumeraremos cada expresión separadamente.

1. "especialista en no saber curar el A.I.D.S. y enviar a sus pobres pacientes ¡a la funeraria!"

2. "La Medicina es un negocio y un fraude"

3. "La más elemental honestidad debería impedirle cobrar estas sumas por desahuciar a los pacientes y enviarlos al notario y la funeraria"

4. "Por lo que sabemos (¡y sabemos muchas cosas!) el Dr. Jorge Garib está contra nosotros 100% y lo ha manifestado en mil y una ocasiones porque lo pusimos en ridículo al comentar su famoso libro por lo absurdo y por lo estúpido como obra de un médico."

5. "a este famoso doctor Jorge Garib se le busca para curar el S.I.D.A., no para hacer diagnósticos inseguros ni dar tratamientos inefectivos. No acepta retos para curar, sólo recomienda testamentos y funerarias, ni siquiera un cura. Los gays lo buscan para curarse no para sus pompas fúnebres, ni para que se equivoque. Y los médicos no quieren enviarle enfermos para que les cobre y los entierre. ¡Sálvese quien pueda! La medicina es para curar no para despedir el duelo ni hacer llorar a las plañideras. ¿Sí o sí?"

6. "embaucó a un público desesperado por curarse de esta llamada terrible enfermedad"

7. "ha convertido su oficina en un comercio descarado."

---

(7) El tribunal de instancia no reconoció daño alguno a la sociedad legal de gananciales. Los demandantes no cuestionaron dicha conclusión, por lo cual la reclamación de dicha sociedad no está ante nos. Por otro lado, las expresiones alegadamente difamatorias no se refieren ni mencionan a la doctora Gurrea, ni tan siquiera se refiere a ella indirectamente ya que el título del libro no se menciona en ninguna de las publicaciones. Por lo tanto, su reclamación es contingente a que la reclamación del doctor Garib resulte exitosa. Véase *Soc. de Gananciales v. El Vocero de P.R.*, 135 D.P.R. 122 (1994). Por la conclusión a la que llegamos en torno a la reclamación del doctor Garib, no es necesario examinar la de la doctora Gurrea.

8. "¡esto es el colmo! Ni Girod ni Peñagar[í]cano fueron tan listos ni actuaron con tanta seguridad".

9. "Los médicos están que trinan ante este caso de megalomanía".

Ni de las determinaciones de hecho contenidas en la sentencia recurrida ni del récord ante nos surgen conclusiones al efecto de que las expresiones contenidas en las dos revistas publicadas fueran falsas, ni tampoco prueba sobre su falsedad. Además, la certeza de muchas de las expresiones alegadamente difamatorias no está sujeta a verificación dado al alto contenido de sátira, humor y opinión subjetiva en las mismas. Examinemos cada expresión en particular.

1. "especialista en no saber curar el A.I.D.S. y enviar a sus pobres pacientes ¡a la funeraria!"

La primera expresión tiende a demostrar, mediante el uso de la sátira y la exageración, la objeción por parte de Clavell en cuanto a los métodos empleados y resultados que ha obtenido el doctor Garib en el tratamiento del S.I.D.A. Es obvio para cualquier lector que nadie se "especializa" en no saber algo. Las palabras escogidas por el autor reflejan una burla a la práctica efectuada por el doctor en relación con el S.I.D.A. Puede ser que el autor haya escogido estas palabras para atraer la curiosidad del lector, considerando que la frase en cuestión está contenida en la portada de uno de los ejemplares. Es un adelanto del contenido de su artículo. En cuanto el resto de la frase, hay porciones del libro escrito por el doctor Garib que le sirven de fundamento. En el capítulo titulado "asuntos legales", el doctor Garib se dirige a "ciertos inconvenientes" legales que los pacientes del S.I.D.A. deben enfrentar. Entre otros, específicamente en la pág. 101 de su obra, se dirige a la cuestión de los arreglos fúnebres:

Hay múltiples maneras para los arreglos fúnebres ... las opiniones pueden variar enormemente y el costo es un factor a

considerar. Podría seleccionarse una casa fúnebre, quizás con un ataúd abierto, un servicio religioso y enterramiento en un cementerio ... [o] una cremación con un servicio humilde en el hogar .... En este momento el embalsamiento se considera como un riesgo para los embalsamadores. J. Garib y C. Gurrea, *Aids, lo que todos debemos saber*, San Juan, Ed. Corripio, 1986, pág. 101.

La expresión sobre el hecho de que el doctor envía a sus pacientes a la funeraria, para algunos connotaría que "los mata". Sin embargo, ningún lector entendería que el autor seriamente le imputa al doctor Garib el delito de asesinato u homicidio. Esta frase, en su totalidad, es un ejemplo de la utilización del lenguaje en un sentido figurado e hiperbólico con el propósito de comunicar otro mensaje más allá del sentido literal de las palabras.

2. "La Medicina es un negocio y un fraude"

La segunda expresión en cuestión se refiere a "la medicina" en general y no se dirige específicamente a las personas de los demandantes. La referida expresión apareció en la portada de uno de los ejemplares, en una columna separada y aparte de la reseña del artículo sobre el doctor Garib, lo que hace difícil que ésta se relacione de manera alguna a la persona del doctor Garib.(8) Por lo tanto, independientemente de su certeza o falsedad, no puede constituir difamación.

3. "La más elemental honestidad debería impedirle cobrar estas sumas [$250.00, $500.00] por desahuciar a los pacientes y enviarlos al notario y la funeraria"

En cuanto a la tercera expresión, del récord no surge prueba que refute que el doctor haya cobrado en ocasiones las sumas de doscientos cincuenta dólares ($250) o qui-

---

(8) Véase *Rosado v. Fluor International*, 81 D.P.R. 608, 616 (1959), donde se establece que las difamaciones hechas contra grupos, si el demandante no puede probar que fue señalado individualmente, no constituyen difamación contra el individuo.

nientos dólares ($500) a sus pacientes. El ataque a la honestidad del doctor constituye una evaluación subjetiva del autor en torno a su práctica y obra. La certeza de la expresión: "la honestidad debería impedirle cobrar estas sumas" no es susceptible de determinarse con evidencia objetiva. Igual que con la primera expresión que examinamos, ningún lector razonablemente interpretaría esta expresión como que seria y realmente le imputa al doctor el hecho de que le cobra a sus pacientes meramente para enviarlos al notario, a la funeraria y por desahuciarlos. Otra vez, se trata del uso de la exageración para comunicar un mensaje.

Además, en el mismo capítulo mencionado anteriormente el doctor Garib recomienda al paciente de S.I.D.A. que acuda a un abogado para organizar los asuntos legales que puedan surgir:

> Una parte básica de poner sus asuntos en orden envuelve cuidar de los aspectos legales. Estos incluyen escribir un testamento, hacer arreglos para poderes de abogados en caso de incapacidad .... Debe pues, consultar su abogado .... De manera que si a una persona se le establece el diagnóstico del S.I.D.A., debe considerar consultar un abogado para la preparación de sus documentos de acuerdo a las necesidades. Garib, *op. cit.*, págs. 100–101.

También hay porciones del libro que tienden a apoyar el hecho de que el doctor Garib, hasta cierto punto, desahucia a las personas diagnosticadas con la enfermedad del S.I.D.A.:

> Ahora podemos tener una imagen más clara sobre un paciente que tiene parte de su sistema de defensa destruido por un virus y que puede adquirir infecciones a repetición, las cuales deben ser tratadas inmediatamente para evitar daños progresivos e irreparables, que pueden llevarlo rápidamente a la muerte.
> Si las infecciones se tratan adecuadamente, el paciente puede tener una mejor calidad de vida, pero es una realidad que aun haciéndose lo correcto, estos pacientes pueden tener tal variedad de infecciones y a repetición y que para muchas de ellas no

existe un tratamiento ideal, que hace que el paciente vaya sufriendo un desgaste físico progresivo ....
Es bueno que se entienda que en este momento (1985) NO hay un tratamiento específico para esta enfermedad. (Énfasis en el original.) Garib, *op. cit.*, págs. 40–41.

4. "Por lo que sabemos (¡y sabemos muchas cosas!) el Dr. Jorge Garib está contra nosotros 100% y lo ha manifestado en mil y una ocasiones porque le pusimos en ridículo al comentar su famoso libro por lo absurdo y por lo estúpido como obra de un médico."

Del libro del doctor Garib surge que como profesional no vislumbra la medicina naturista como una alternativa viable al tratamiento del S.I.D.A. En la pág. 98 de su obra expresa que "las personas que han estado expuestas al virus ... comienzan a sentir tal grado de miedo y ansiedad que salen a buscar evaluación profesional en una forma desordenada, hasta que llegan donde alguien que les ofrece vacunas y/o *tratamiento basados en plantas*, los que les dan una falsa esperanza, y es así que se convierten en víctimas de su propio estado de desesperación ...". (Énfasis suplido.) Estas expresiones tienden a demostrar que el doctor Garib sostiene una opinión en contra del uso de métodos recomendados por los naturistas, según expresado en la cuarta alegada difamación. Nada en el récord contradice esta posición. El resto de la frase, una crítica que cataloga el libro como absurdo y estúpido, constituye una mera opinión subjetiva del autor que no denota hecho alguno cuya verdad pueda ser determinable sobre una base objetiva de evidencia.

5. "a este famoso doctor Jorge Garib se le busca para curar el S.I.D.A., no para hacer diagnósticos inseguros ni dar tratamientos inefectivos. No acepta retos para curar, sólo recomienda testamentos y funerarias, ni siquiera una cura. Los gays lo buscan para curarse no para sus pompas fúnebres, ni para que se equivoque. Y los médicos no quieren enviarle enfermos para que les cobre y los entierre. ¡Sálvese quien pueda! La medicina es para curar no para despedir el duelo ni hacer llorar a las plañideras. ¿Sí o sí?"

La quinta expresión, sumamente satírica y humorística, es una repetición de las críticas antes expresadas relacionadas al tratamiento del paciente de S.I.D.A. y la recomendación de acudir al abogado y a la funeraria. En cuanto al diagnóstico inseguro, el doctor Garib acepta en la pág. 63 de su libro que "[e]n este momento no existe una prueba diagnóstica definitiva para establecer el diagnóstico del S.I.D.A.".

6. "embaucó a un público desesperado por curarse de esta llamada terrible enfermedad"
7. "ha convertido su oficina en un comercio descarado."

En las expresiones sexta y séptima, Clavell aparenta imputarle al doctor engañar al público y llevar a cabo un "comercio descarado". Las oraciones en las que aparecen estas frases disponen lo siguiente: "Publicó su 'best-seller' sobre el A.I.D.S. sin ser escritor, lo cual es un logro real, *porque embaucó a un público desesperado por curarse de esta llamada terrible enfermedad .... Ha convertido su oficina en un comercio descarado* y hace que los condenados a muerte por su sabiduría repitan sus citas con él en lugar de referirlos a los religiosos de su predilección, que es lo que debería hacer." Del contexto en que aparecen estas expresiones podemos ver que éstas reflejan la visión del autor y de un sector del naturismo hacia los médicos tradicionales. Las expresiones en cuestión no van dirigidas a imputarle fraude o engaño al doctor. Ningún lector razonable así lo entendería. El mensaje de estas expresiones, más allá de su sentido literal, es que lo métodos utilizados y recomendados por el doctor no son efectivos. Este mensaje constituye una opinión subjetiva cuya certeza no es susceptible de ser medida.

8. "¡esto es el colmo! Ni Girod ni Peñagar[í]cano fueron tan listos ni actuaron con tanta seguridad".
9. "Los médicos están que trinan ante este caso de megalomanía".

La octava expresión se utiliza a manera de burla y sátira. Ningún lector razonablemente concluiría que el doctor Garib, de hecho, ha actuado como los banqueros Girod y Peñagaríc*a*no. No es una frase cuya certeza esté sujeta de verificación, ya que se trata del uso de la sátira y el humor como estilo literario. Similarmente, la descripción del doctor como un "caso de megalomanía" pertenece más bien al ámbito de la sátira humorística y la creatividad literaria. Ningún lector pensaría que, de hecho, el doctor sufre de la enfermedad psicológica. Igualmente, ningún lector interpretaría estas expresiones como que el autor, realmente, le imputa al doctor Garib sufrir de megalomanía o de actuar como Girod y Peñagarícano. El contenido de estas expresiones es obviamente falso, y así lo entiende el público lector. Como tal, no puede decirse que es difamatorio.

Del análisis que antecede surge que ninguna de las expresiones alegadamente difamatorias sostiene una causa de acción en el presente caso. Algunas de las expresiones contienen tal grado de sátira e hipérbole que ningún lector las interpretaría como una aseveración fáctica por parte del autor. Las restantes expresiones son opiniones subjetivas del autor y de un segmento del naturismo, cuya certeza no es fáctica y objetivamente determinable. Alternativamente, el récord ante nos tiende apoyar la certeza de muchas de las aseveraciones alegadamente difamatorias.

Aún asumiendo que todas las expresiones hechas por Clavell fueran falsas, es imposible que su reclamación prospere, ya que el doctor Garib es figura pública y no se ha demostrado la existencia de malicia real.

El tribunal de instancia erró al determinar que el doctor Garib es figura privada a efectos de la doctrina aplicable. El doctor ha adquirido notoriedad en la sociedad puertorriqueña *en relación al tema de la enfermedad S.I.D.A.* No es necesario, según se intima en la sentencia recurrida, que dicha notoriedad sea de tipo general.

██ La jurisprudencia señala que basta para ese fin que la prominencia adquirida sea relativa a un tema en específico. No hay duda que el doctor Garib, como distinguido médico-autor de un libro sobre el S.I.D.A., que participa frecuentemente en conferencias, debates, foros, etc. relativos al S.I.D.A. y otras enfermedades infecciosas, y como médico cuya opinión a esos efectos se cita en los medios de comunicación, cumple con el elemento de notoriedad. El doctor Garib, además, tiene el poder para influir y persuadir en la discusión y debate del tema en cuestión. La notoriedad que ha adquirido en cuanto a este tema le ha permitido acceso a los medios de comunicación para exponer sus puntos de vista sobre el particular. Tomamos conocimiento judicial de la participación activa que ha tenido respecto a la discusión sobre el virus del S.I.D.A. a través de la radio y de la televisión durante los últimos años. La publicación de su libro, en sí, le ha concedido un acceso a los medios de comunicación que no es compatible con el concepto de la figura privada. Finalmente, no hay duda que el doctor Garib voluntariamente ha participado de forma muy activa en la discusión sobre la enfermedad del S.I.D.A. Prueba de ello es la publicación de su libro. Tampoco hay duda de que su involucramiento en este controversial tema lo ha hecho, al menos en parte, para "inclinar la balanza" en la resolución de las cuestiones implicadas. En la pág. 15 de su libro, Garib expresó a estos efectos:

> Después de entender lo antes descrito, vemos la necesidad como pueblo de enfrentarnos al S.I.D.A. en una forma lógica, definida y contundente. Sólo así podremos alterar el curso actual de la enfermedad.
> Siendo esto una problemática de interés comunitario y que requiere de una educación integral, hemos decidido escribir este pequeño libro que servirá como una guía en la acción colectiva de los ciudadanos.

Muchas de las expresiones contenidas en su libro van dirigidas a "guiar la acción colectiva de los ciudadanos" en

torno a las problemáticas controversiales que ha ocasionado el S.I.D.A. A modo de ejemplo, en el capítulo titulado "Guías útiles para escuelas, artistas y otras personas expuestas involuntariamente al S.I.D.A.", el doctor opina que los maestros y estudiantes diagnosticados con la enfermedad deben ser aceptados en las escuelas, sujeto a que respeten las reglas de seguridad. Sugiere, además, la creación de comités que decidan sobre la permanencia de estas personas en las escuelas, decisión que se hará a base de no tener "duda alguna donde se rompe la regla de seguridad". Garib, *op. cit.*, pág. 103.

Siendo el doctor Garib figura pública, tiene que probar que Clavell hizo las expresiones en cuestión con malicia real.[9]

Hemos expresado la necesidad de probar mediante prueba clara y convincente que el demandado publicó la información alegadamente difamatoria albergando serias dudas en cuanto a su certeza. Véanse: Clavell, *supra*, pág. 696; *García Cruz v. El Mundo, Inc.*, supra, págs. 180–181 y 183; *Soc. de Gananciales v. López,* supra, pág. 115.

El tribunal de instancia, como conclusión de derecho, expresó lo siguiente:

> El Tribunal concluye que la información se publicó a sabiendas de que era falsa o con grave menosprecio de si era falsa o no. Se trata de publicaciones maliciosas dirigidas a causar daño sobre las personas de los demandantes. No se trata de una publicación de hechos correctos en forma neutral sobre un asunto de interés público. Consideramos que es libeloso per se señalar a un médico en el ejercicio de su profesión como un embaucador comparable a personas convictas de delitos relacionados con manejos ilegales de dinero.

No es suficiente alegar la malicia real o repetir las palabras sacramentales de la doctrina, de manera concluso-

---

[9] Concluimos que la obra de Clavell lo clasifica como prensa a efectos de la doctrina aplicable. No hay duda que sus artículos y la revista Salud Natural, de la cual era Director y Jefe de Redacción al ocurrir los hechos, es un medio de proveer información, formar opiniones y una visión crítica en torno al tema de la medicina, en general, y la enfermedad del S.I.D.A., en específico.

ria, para determinar la existencia de la malicia real. Aunque es cierto que las palabras escogidas por Clavell demuestran animosidad y mala voluntad hacia la práctica y obra del doctor Garib, la mayor parte de ellas son tan ridículamente exageradas que ningún lector razonable las creería. La jurisprudencia ha aclarado que esto no es suficiente. Igualmente, la casuística citada establece que una expresión no tiene que ser neutral y contener información necesariamente correcta para que esté protegida. Los ataques vehementes, cáusticos y cortantes también están protegidos. Finalmente, es importante notar que la malicia real *nunca* se puede presumir. El doctor Garib no logró satisfacer el criterio riguroso al cual se somete la prueba de todo demandante que es figura pública.

Por todos los fundamentos que anteceden, *procede revocar en su totalidad la sentencia dictada por el tribunal de instancia y desestimar la demanda.*

*Se dictará sentencia conforme a las expresiones aquí contenidas.*

El Juez Asociado Señor Negrón García concurrió sin opinión escrita.