*913 TEXTO COMPLETO DE LA SENTENCIA
Hechos
El 28 de febrero de 1998, el Sr. Rafael Venegas y sus hermanos suscribieron un contrato de servicios profesionales en el cual acordaron contratar al Ledo. Rafael E. Silva Almeyda (Ledo. Silva Almeyda) para que los representara en el caso Lucy Chávez Butler v. Rafael Venegas Hernández, et. als., Civil Núm. C AC1997-0421 (404). [1] En aquel pleito sobre liquidación de bienes, la viuda del fenecido padre de los hermanos Venegas, el Sr. Guillermo Venegas Lloverás, reclamó como bien ganancial los derechos de autor de las canciones compuestas por éste durante su vida.
Por su parte, el Ledo. Silva Almeyda aceptó la representación legal de los hermanos a cambio de “...$75.00 por hora trabajada en el caso o un treinta y tres por ciento (33%), más gastos, de toda cantidad recuperada... lo que sea mayor.” [2] Además, las partes acordaron que el Ledo. Silva Almeyda sería acreedor de $75.00 por todas las horas trabajadas en el pleito de liquidación de bienes si éste llegara a renunciar a la representación legal convenida. [3]
Transcurrido más de un año de representación legal, el 27 de septiembre de 1999, el Ledo. Silva Almeyda presentó una solicitud de renuncia ante el Tribunal de Primera Instancia, Sala Superior de Arecibo. Alegó que existían graves problemas de comunicación y controversias entre él y sus clientes con relación a las estrategias procesales y el manejo del pleito. De igual manera, alegó que sus clientes no cooperaban con él para solucionar el caso efectivamente y con prontitud. Posteriormente, el tribunal de instancia autorizó la renuncia solicitada por el Ledo. Silva Almeyda.
*914 El 22 de septiembre de 1999, dicho foro resolvió que los derechos de autor sobre la música, arte y literatura del compositor fenecido, Sr. Guillermo Venegas Lloverás, constituyen bienes privativos que pertenecen exclusivamente a sus herederos descendientes. [4] El 2 de noviembre del mismo año, el Ledo. Silva Almeyda envió una factura a los hermanos Venegas para cobrar los honorarios de abogado devengados por el trabajo que realizó en el referido pleito, según lo pactado por las partes en el contrato de servicios profesionales. La suma total de la deuda acumulada en aquel momento era de $15,753.39.
Así las cosas, el 23 de junio de 2000, el periódico El Nuevo Día publicó una historia titulada: Se esfuma una demanda contra sello Fonovisa. En la misma, su autor relató cómo los abogados del compositor puertorriqueño Johnny Ortiz desistieron parcialmente de una demanda instada en el Tribunal Federal de Distrito para el Distrito de Puerto Rico contra Fonovisa. [5] En esa demanda, el Sr. Johnny Ortiz reclamó una indemnización de $6,000,000 y la prohibición de la distribución de una producción discográfica de la cantante Nahyra por ésta alegadamente utilizar las obras del demandante sin su autorización. Los abogados del compositor en ese caso fueron los Ledos. Rafael E. Silva Almeyda y Jesús Rabell Méndez.
El mismo día, el Sr. Rafael Venegas publicó en su portal personal en el Internet una historia titulada: Demanda de Johnny Ortiz por $6 millones contra Fonovisa no prospera, pero pendiente contra Distribuidora Aponte. [6] La historia leía como sigue:

“Guía del Compositor

NOTICIAS Y ANALISIS

23 de junio del (sic) 2000

Esta noticia apareció (sic) compositor puertorriqueño canciones (“Si así tu eres” sabor”) sin licencia has (sic) sido desistida por sus propios abogados, Rafael E. Silva Almeyda y Jesús Rabell Méndez luego de presentar su prueba ante el juez federal Juan M. Pérez Giménez (sic). Las demandas contra Distribuidora Aponte, propiedad del Sr. Pablo Aponte, quien también es dueño de la disquera disco (sic) Hit continua, en rebeldía, pues la Distribuidora Aponte ni siquiera (sic) contesto (sic) la demanda ni se presento (sic) con representación (sic) legal ante el tribunal. en la prensa de Puerto Rico: La demanda radicada en agosto del 1997 que el Johnny Ortiz había radicado contra la disquera Fonovias (sic) por usar dos y “Soy la peregrina” fueron incluidos (sic) en el CD de Nahyra, “De vuelta al

El abogado de Fonovisa, Alfredo E. Castellanos Bayoiith, hijo d,el juez federad Castellanos.

ANALISIS

Este es un caso raro y difícil (sic) de entender por una sencilla razón (sic): Un compositor no tiene que probar nada (sic) en caso como este. Es la disquera la que tiene que probar que tenia (sic) la licencia para usar las canciones y que ha pagado las regalias (sic) correspondientes. Si en este caso, la disquera SI tenia (sic) la licencia para usar las canciones, esa prueba se la tenia (sic) que haber dado a los abogados del compositor, quiene (sic) tenían (sic) la obligación (sic) de analizar la prueba antes de radicar una demanda que que (sic) no prosperara en los tribunales y que resultaría (sic) en gastos legales innecesarios para el compositor Johnny Ortiz. Aparentemente en este caso los abogados de Johnny Ortiz no hicieron su trabajo o no fueron efectivo (sic) en su gestión (sic) de pedirle a Fonovisa que explicaran su uso de las canciones antes de radicar la demanda. Por otro lado si Fonovisa, previo a la demanda, no quiso divulgar información (sic) sobre su licencia para el uso de las canciones a Johnny Ortiz o a sus abogados y la tenia (sic) (la licencia) como una sorpresa para presentarla en los tribunales, eso seria (sic) causa para una sanción (sic) contra Fonovisa y su abogado ya que el único (sic) resultado es el de crear trabajo innecesario a los tribunales y a los abogados , *915 abogados que se lucran del proceso alargado, y que mientras mas (sic) se alárgale caso mas (sic) ganan.

Obviamente aquí (sic) hubo un proceso legal viciado contra Fonovias (sic) o el compositor o ambos y a favor de uno o mas (sic) abogados.

Nota: Es opinion (sic) del analista que abogados hijos de jueces federales no deben postular en los tribunales federales, pues seguramente no hay un juez federal que pueda quedar, aunque sea injustamente, libre de sospechas da (sic) favoritismos hacia hijos de compañeros de trabajo. Si un juez se tiene que abstener de un caso por cuestión (sic) de amistad con una de las partes, porque no por ser compañero de trabajo de un padre de una de las partes?

Nota: Se desconoce el desenlace final de esta demanda contra Distribuidora Aponte.

Premio:

Se le otorga 1 premio caravela (sic), por impericia o chapucería (sic) legal o simplemente por perder un caso o por radicar una demanda sin fundamento a los abogados de Johnny Ortiz, Ledo. Rafael Silva Almeyda y Jesús Rabell Méndez. También (sic) por hacerle perder el tiempo y/o el dinero al compositor. ” (El original incluye una imagen de una carabela cruzada por dos huesos.) [7]
Luego de varios intentos infructuosos para cobrar sus honorarios de abogado, el 4 de agosto de 2001, el Ledo. Silva Almeyda presentó una demanda de cobro de dinero en contra de los hermanos Venegas. En la alegación responsiva, los hermanos Venegas afirmaron que suscribieron un contrato de servicios profesionales con el Ledo. Silva Almeyda; no obstante, expusieron que los honorarios acordados serían exigibles al finalizar el caso de liquidación de bienes. Alegaron que dicho contrato fue redactado de esa manera porque éstos no contaban con los recursos necesarios para pagar la representación legal acordada hasta que obtuvieran el producto de la sentencia del referido caso. Además, alegaron que la cantidad reclamada por honorarios de abogado no se ajustaba a los servicios rendidos por el Ledo. Silva Almeyda.
Los hermanos Venegas también presentaron una reconvención en contra del Ledo. Silva Almeyda, reclamando que sufrieron daños emocionales y materiales cuando el Ledo. Silva Almeyda renunció sin justificación alguna a la representación legal y cuando exigió reiteradamente el pago de sus honorarios sin que los mismos hubieran vencido. De igual manera, los hermanos Venegas alegaron que el Ledo. Silva Almeyda cometió impericia profesional en varias instancias relacionadas con el manejo del pleito de liquidación de bienes, por lo que reclamaron quántum reparador de $13,839,00.
Durante la tramitación del pleito de cobro de dinero, a principios de diciembre de 2003, el Ledo. Silva Almeyda se encontraba ofreciendo un curso en la Universidad de Puerto Rico cuando una de sus estudiantes le mencionó que había leído “algo feito en Google” sobre él. [8] Luego de hacer la correspondiente búsqueda, el Ledo. Silva Almeyda leyó el artículo publicado por el Sr. Rafael Venegas en su portal personal Guía del Compositor. Por ello y por sentir que su reputación había sido atacada, el 22 de enero de 2004 presentó una demanda en la cual reclamó $2,000,000 como compensación por los daños que alegadamente le causaron las expresiones redactadas en el mencionado artículo. Expuso que las mismas constituían libelo y su falsedad perjudicó su reputación.
Durante la tramitación de este nuevo pleito sobre difamación, el Ledo. Silva Almeyda fue contratado por la Corporación de Puerto Rico para la Difusión Pública (WIPR) para que representara a esa institución en un caso contra la Asociación de Compositores y Editores de Música Latinoamericana o ACEMLA. Dicha contratación se efectuó a través de la presidenta y de la asesora legal de WIPR, Sra. Yolanda Zavala y la Leda. Nancy Piñero, respectivamente.
*916 En una reunión relacionada con el mencionado caso, esta última le comentó al Ledo. Silva Almeyda que había conversado por teléfono con el Sr. Rafael Venegas. Que en el transcurso de esa conversación, sobre los derechos necesarios para que WIPR utilizara varias canciones de su padre, éste le comentó que el Ledo. Silva Almeyda había trabajado en el pleito de distribución de bienes, que era un “charlatán”, y que había cometido un grave error al contratarlo. [9]
Posteriormente, el Sr. Rafael Venegas publicó un libro titulado ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales bajo el seudónimo José Dandero Sevilla. Según éste, dicho libro está compuesto por 100 capítulos con tono humorístico que comentan los esfuerzos de los hermanos Venegas para proteger y cobrar por los derechos de autor de la música compuesta por el Sr. Guillermo Venegas Lloverás. Además, que la obra literaria comenta los problemas del sistema jurídico de Puerto Rico con relación al tema de propiedad intelectual y de la música. El Sr. Rafael Venegas incluyó en la página 16 de dicho libro un capítulo sobre la anteriormente señalada demanda de distribución de bienes instada por la viuda del fenecido compositor. Dicho capítulo, titulado Espiral de demandas y mas (sic) demandas, lee como sigue:

“Espiral de demandas y mas (sic) demandas

Eventualmente, la albacea causa una (sic) espiral de demandas y contrademandas (sic) que los tribunales no saben evitar ni resolver y que llevan a las victimas (sic) a la bancarrota y a los tribunales a la sobrecarga de “trabajo ” inútil para la sociedad. Esto ha ocurrido:

1. Para finales de 1997. (sic) la albacea demandó a los herederos de GUILLERMO, para que el tribunal ordenara a los herederos a reconocerla como dueña de la música de GUILLERMO y para alegadamente “cerrar ” la repartición de la herencia.

2. Los herederos contrataron a Ratil para que los representara en la demanda. Ratil acordó que se le pagaría al finalizar el caso.

3. Ratil contra demandó (sic) a la albacea y a ACEROBA por 21 millones de dólares. No consiguió ni un centavo de esos 21 millones. Seria (sic) un jueguito de esos que tienen los tribunales.

4. En 2000, el tribunal decide que la música pertenece a los herederos basado en tres hechos: a) la albacea ya había acordado con los herederos que la música pasaba a ellos, b) lo dicho en el testamento, que a la albacea le tocaba únicamente una propiedad, c) la ley establece que los derechos de autor no son bienes gananciales.

5. A las alturas del 2004, once años luego del fallecimiento de GUILLERMO, el caso de repartición de herencia continua (sic) en otro tribunal. Los abogados de ACEROBA han alegado en este caso que la repartición de la herencia fue completado (sic). El tribunal no creyó eso.

6. El abogado Ratil, en 2000, demandó a los herederos ex clientes para cobrar sus honorarios legales a pesar de que el caso no había terminado y esa deuda no estaba vencida según fue pactado. Los herederos contra demandaron (sic) a el (sic) abogado Ratil por su alegada impericia en el caso. El abogado Ratil se ha defendido diciendo que los herederos tenían una sed de venganza contra la albacea, dentando así cuales eran sus simpatías (anti propio cliente) en el caso donde el (sic) representaba a los herederos de GUILLERMO.

7. El abogado Ratil, en 2001, demandó a su sucesor abogado alegando que éste era el responsable de que la deuda de honorarios legales no se le pagaran. Un caso insólito en los anales (sic) de los tribunales de Puerto Rico. El caso desapareció (sic) sin rastros en Arecibo.

8. En 2004, el abogado Ratil demandó a un heredero de GUILLERMO porque alegadamente este (sic) lo *917 difamó al criticar su actuación (por chapucería (sic) legal a (sic) y otras alegaciones) en otro caso de derechos de autor que el (sic) tenia (sic) contra una disquera. Es la segunda demanda de Ratil contra sus ex clientes herederos de GUILLERMO. Nos prguntamos (sic): Tiene Ratil una alianza con ECEROBA (sic)?

9. La albacea sigue desaparecida de su rol de albacea bajo la protección de los abogados de ACEROBA y de los tribunales.

10. La albacea y la editora ACEROBA, a finales del 2004, siguen actuando como si fuesen dueños de la música, ignorando así lo decidió (sic) por el tribunal. Nada ha pasado. Ese era el plan. ”

.. .(continúa) [10]
El 22 de abril de 2005, aún pendiente los pleitos sobre cobro de dinero y sobre difamación, el Ledo. Silva Almeyda presentó una tercera demanda en contra del Sr. Rafael Venegas. En la misma alegó haber sufrido daños como consecuencia de las expresiones contenidas en el libro ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales. También alegó que fue objeto de burlas entre sus compañeros por causa del sobrenombre “Ratil”. Además, alegó que el Sr. Rafael Venegas interfirió intencionalmente en su relación contractual con WIPR durante la conversación telefónica que sostuvo con la Leda. Nancy Piñero, justo después de haber sido contratado por dicha institución. Finalmente, el Ledo. Silva Almeyda planteó que la conducta y las actuaciones del Sr. Rafael Venegas constituían persecución maliciosa. Por todo ello reclamó una suma no menor de $2,000,000 en daños. Ambas demandas por expresiones difamatorias fueron consolidadas por el tribunal recurrido (TPI).
Luego de varias incidencias procesales, dicho foro designó a una Comisionada Especial, la Leda. Berta Mainardi Peralta, para que recibiera la prueba testifical y documental, y rindiera un informe con sus recomendaciones.
Celebrada la correspondiente vista evidenciaría, la Comisionada Especial emitió su informe el 24 de octubre de 2007. En síntesis, determinó que no procedían las causas de daños relacionadas con las expresiones publicadas por el Sr. Rafael Venegas en la Guía del Compositor y en el libro ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales. Según la Comisionada, ambas publicaciones estaban protegidas por las doctrinas de “informe justo y verdadero”, “comentario imparcial” e “hipérbole retórica”. Por lo contrario, determinó que las expresiones realizadas por el Sr. Rafael Venegas durante su conversación telefónica con la Leda. Nancy Piñero constituían calumnia y que las mismas no estaban protegidas por nuestro ordenamiento jurídico. Con relación a la causa de acción de interferencia culposa de terceros con obligaciones contractuales ajenas, la Comisionada Especial determinó que, a pesar de que las expresiones del Sr. Rafael Venegas constituían calumnia, las mismas no interfirieron de manera alguna con la relación contractual existente entre WIPR y el Ledo. Silva Almeyda. Finalmente, la Comisionada determinó que este último no presentó prueba para sostener los requisitos de su causa de acción de persecución maliciosa. En su consecuencia, la Comisionada Especial recomendó que el TPI otorgara $8,000.00 al Ledo. Silva Almeyda como compensación por los daños sufridos a su honor y reputación, por angustias emocionales, y por concepto de gastos del litigio.
Instancia aceptó las determinaciones de hechos y derecho, al igual que las recomendaciones formuladas por la Comisionada Especial, e incorporó las mismas en una Sentencia que emitió el 15 de enero de 2008. Sin embargo, dicho foro aumentó la compensación otorgada al Ledo. Silva Almeyda a $10,000. La Sentencia no fijó partida alguna por concepto de costas del litigio ni honorarios de abogado “...por tratarse de planteamientos novedosos y cuestiones de derecho legítimas.” [11]
No conforme, el Ledo. Silva Almeyda recurre en la apelación KLAN-2008-00421 y plantea que el tribunal *918 sentenciador incidió de la siguiente manera:
“Erró el Tribunal de Primera Instancia al determinar que [el Sr. Rafael Venegas] hacía las funciones de “Prensa” al momento de escribir las expresiones que motivaron la presente demanda.
Erró el Tribunal de Primera Instancia al determinar que [el Sr. Rafael Venegas] no cometió Libelo contra [el Ledo. Silva Almeyda] al momento de escribir las expresiones que motivaron la presente demanda, debido a que dichas expresiones alegadamente estaban cobijadas por la defensa de “Reporte Justo y Verdadero ”.
Erró el Tribunal de Primera Instancia al determinar que [el Sr. Rafael Venegas] no cometió Libelo contra [el Ledo. Silva Almeyda] al momento de escribir las expresiones que motivaron la presente demanda, debido a que dichas expresiones alegadamente estaban cobijadas por la “Defensa del Comentario Imparcial”.
Erró el Tribunal de Primera Instancia al determinar que [el Sr. Rafael Venegas] no cometió Libelo contra [el Ledo. Silva Almeyda] al momento de escribir las expresiones que motivaron la presente demanda, debido a que dichas expresiones alegadamente estaban cobijadas por la defensa de “Hipérbole Retórica”.

Erró el Tribunal de Primera Instancia al aplicar equívocamente el derecho correspondiente a los hechos y causa de acción constitutivos de “Interferencia Culposa de Terceros”.

Erró el Tribunal de Primera Instancia al no atender ni resolver expresa y convincentemente los argumentos de “Persecución Maliciosa” expuestos por [el Ledo. Silva Almeyda] en su demanda.
Erró el Tribunal de Primera Instancia al no conceder “Costas” [al Ledo. Silva Almeyda] por alegadamente ser novedosa la presente controversia. ”
Por su parte, el Sr. Rafael Venegas Hernández, la Sra. Zoraida Cáez y la Sociedad Legal de Gananciales compuesta por ambos, recurren ante nos, en la apelación KLAN-2008-00442 y plantean que el tribunal sentenciador cometió los siguientes errores:

“Erró el Tribunal de Primera Instancia al imponer una cuantía en daños por los hechos alegadamente constitutivos de la causa de acción de interferencia contractual que fue declarada sin lugar.

Erró el Tribunal de Primera Instancia al determinar probado que WIPR solicitó al Sr. Venegas Hernández el desistimiento de la querella presentada contra [el Ledo. Silva Almeyda],

Erró el Tribunal de Primera Instancia al no imponer a Silva Almeyda el pago de gastos y costas a favor de Venegas Hernández”.

Por otro lado, el 22 de febrero de 2008, el tribunal recurrido emitió Sentencia en el caso de cobro de dinero, condenando a los hermanos Venegas a pagarle al Ledo. Silva Almeyda la cantidad de $15,753.39 por concepto de honorarios de abogado más intereses legales. Además, desestimó la reconvención instada por los hermanos Venegas.
Inconformes con dicha determinación, éstos recurren mediante la apelación KLAN-2008-00441 e imputan al TPI incidir de la siguiente forma:

“Erró el Tribunal de Primera Instancia al declarar sin lugar la reconvención y evadir entrar a evaluar cada alegación de la reconvención de acuerdo a la prueba presentada. 
*919
Erró el Tribunal de Primera Instancia al interpretar el contrato de servicios profesionales y concluir que los honorarios del Lie. Silva Almeyda están vencidos y son exigibles. ”

Las causas del epígrafe, aunque presentadas en forma separada, atienden un mismo asunto por lo que, mediante Resolución notificada el 2 de mayo de 2008, consolidamos para su disposición. Con el beneficio de los referidos escritos, procedemos a resolver.
Nos corresponde determinar si el TPI actuó correctamente al desestimar las causas de acción de daños por expresiones alegadamente difamatorias, de interferencia culposa de terceros con obligaciones contractuales ajenas, y de persecución maliciosa. Además, nos corresponde dirimir si dicho foro incidió de alguna manera al aprobar la causa de acción en cobro de dinero y al desestimar la correspondiente reconvención instada por los hermanos Venegas.
Exposición y Análisis
Por estar estrechamente relacionados, discutiremos conjuntamente los primeros cuatro señalamientos de la causa KLAN-2008-00421.
I
El Ledo. Silva Almeyda nos plantea que el tribunal recurrido incidió al determinar que el Sr. Rafael Venegas no lo difamó cuando publicó la Guía del Compositor y ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales. Expone que el TPI erró al aplicar las doctrinas del “reporte justo y verdadero", y las defensas de “privilegio del comentario imparcial”, y de “hipérbole retórica” al resolver.
La protección contra expresiones difamatorias ha sido reconocida específicamente en nuestro ordenamiento jurídico desde principios de este siglo. En términos generales, la difamación es desacreditar a una persona por medio de la publicación de expresiones contra su reputación. Pérez Rosado v. El Vocero de Puerto Rico, 149 DPR 427 (1999). El Código de Enjuiciamiento Civil de Puerto Rico desde 1902 reconoce la acción civil por los daños y perjuicios causados como consecuencia de expresiones difamatorias, ya sean mediante libelo o calumnia. Sec. 1 de la Ley de Libelo y Calumnia, Ley del 19 de febrero de 1902, 32 LPRA see. 3141.
Dicho estatuto, en lo pertinente, define libelo como la difamación maliciosa que públicamente se hace en contra de una persona, por escrito, impreso, signo, retrato, figura, efigie u otro medio mecánico de publicación, tendente a exponer a dicha persona al odio del pueblo o a su desprecio, o a privarle del beneficio de la confianza pública o trato social, o a perjudicarle en sus negocios; o de otro modo desacreditarle, menospreciarle o deshonrarle. 32 LPRA see. 3142. Por su parte, se define calumnia como la publicación falsa o ilegal, que no sea un libelo, y que impute a una persona la comisión de un hecho constitutivo de delito, o tienda directamente a perjudicarle con relación a su oficina, profesión, comercio o negocios, o que como consecuencia natural, le cause daños reales y efectivos. 32 LPRA see. 3143.
En resumidas cuentas, la diferencia entre los dos tipos de difamación consiste en que el libelo requiere un escrito o constancia física de la expresión difamatoria, mientras que la calumnia es básicamente una expresión verbal. [12]
La acción por difamación también procede al amparo de Art. 1802 del Código Civil de Puerto Rico, [13] 31 LPRA see. 5141, que en su versión original, excluyente de la responsabilidad concurrente del perjudicado introducida en el 1956, impone responsabilidad de reparación a todo el que por acción u omisión cause daño interviniendo culpa o negligencia desde el año 1890. No obstante, la fuente primaria de protección contra expresiones difamatorias la proveen dos preceptos constitucionales, incluidos en la Carta de Derechos de la Constitución del Estado Libre Asociado desde el año 1952 y en la Primera Enmienda de la Constitución *920 Federal. [14]
La Sección 8 del Artículo II de la Constitución del Estado Libre Asociado, dispone que “...toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, su reputación y a su vida privada o familiar.” El ejercicio de este derecho, mediante la acción por difamación, tiene que contraponerse al ejercicio del derecho fundamental de libertad de expresión y de prensa. Porto y Siurano v. Bentley P.R. Inc., 132 DPR 331 (1992); Méndez Arrocho v. El Vocero de P.R., 130 DPR 867 (1992). La See. 4 del Art. II de nuestra Constitución, que establece tal derecho, dispone que “...no se aprobará ley alguna que restrinja la libertad de palabra o de prensa.” Aunque estas disposiciones constitucionales son de mayor jerarquía, la Ley de Libelo y Calumnia “...sobrevive solamente en tanto y en cuanto es compatible con la Constitución.” Pérez Rosado v. El Vocero de Puerto Rico, supra, a la pág. 441.
Al atender una controversia donde ambos derechos se enfrentan, los tribunales deberán armonizar el interés en una ciudadanía debidamente informada y en fomentar el debate sobre la cuestión pública frente al derecho a la intimidad de los individuos. Méndez Arocho v. El Vocero de Puerto Rico, supra, Maldonado y Negrón v. Marrero y Blanco, 121 DPR 705 (1988). Debido al ejercicio de balance de intereses que debe emplear el juzgador, el Tribunal Supremo ha introducido varias limitaciones a la responsabilidad por difamación. Por ejemplo, dicho foro adoptó la doctrina de “of and concerning the plaintiff’ en nuestra jurisdicción en Sociedad de Gananciales v. El Vocero de Puerto Rico, Inc., 135 DPR 122, 128 (1994). Dicha doctrina requiere que la expresión difamatoria haga referencia a la persona difamada en particular. Por otro lado, en las acciones por difamación, sólo procede la compensación por los daños a la reputación y buen nombre del perjudicado, y no la indemnización por las angustias mentales provocadas por la publicación de la información. Sociedad de Gananciales v. El Vocero de Puerto Rico, Inc., supra, Porto v. Bentley Puerto Rico, supra.
De igual manera, el quántum evidenciarlo varía dependiendo de si el perjudicado por la expresión difamatoria es una figura pública o una persona privada. González Martínez v. López, 118 DPR 190 (1987); Oliveras v. Paniagua Diez, 115 DPR 257 (1984). Cuando se trate de una figura pública tendrá que probar que: (1) la información difundida era falsa y difamatoria, (2) le causó daños reales, y (3) el demandado actuó con malicia real. Villanueva v. El Vocero de P.R., Inc., supra, Maldonado y Negrón v. Marrero y Blanco, supra.
Por lo contrario, para que prospere una acción por difamación instada por una persona privada, como lo es en este caso el Ledo. Silva Almeyda, [15] es necesario que pruebe que: (1) la publicación es falsa y difamatoria, (2) como consecuencia de tal publicación ha sufrido daños reales, y (3) tal publicación fue difundida negligentemente. [16] Villanueva v. Hernández Class, 128 DPR 618 (1991); Maldonado y Negrón v. Marrero y Blanco, supra; Ocasio Carrasquillo v. Rosa Berrios, 121 DPR 37 (1988); Oliveras v. Paniagua Diez, supra.
El Tribunal Supremo también ha adoptado distintas doctrinas que sirven como defensas ante una acción por difamación. Las mismas derrotan dicha acción cuando el balance de intereses se inclina hacia la protección del derecho a la libertad de expresión y de la prensa a pesar de que las expresiones impugnadas efectivamente constituyan descrédito. Estas doctrinas incluyen el “reporte justo y verdadero”, la defensa del “privilegio del comentario imparcial”, y la doctrina de la “hipérbole retórica”.
Con relación a la doctrina del “reporte justo y verdadero”, la See. 4 de la Ley de Libelo y Calumnia, 32 LPRA see. 3144, expresamente contempla aquellas instancias en las que ciertas comunicaciones se entienden privilegiadas, y por ende no maliciosas, en consideración al contexto en que se producen. La referida sección dispone:

“No se tendrá por maliciosa, ni como tal se considerará la publicación que se hace en un procedimiento legislativo, judicial, u otro procedimiento cualquiera autorizado por la ley. No se presumirá que es maliciosa la publicación que se hace:

*921
Primero: En el propio desempeño de un cargo oficial;

Segundo: En un informe justo y verdadero de un procedimiento judicial, legislativo u oficial, u otro procedimiento cualquiera, o de algo dicho en el curso de dichos procedimientos;

Tercero: A un funcionario oficial, apoyada en causa probable, con la intención de servir al pro común, o de conseguir remedio a un perjuicio hecho a un particular. ”

El reporte es “justo” si refleja la sustancia de lo acontecido en el proceso trasmitido y si toma en consideración el efecto probable que tendrá en el receptor promedio. Además, es indispensable que lo publicado sea cierto. Esto significa que “...aun cuando la información que se brinda en el procedimiento judicial, legislativo u oficial sea inherentemente falsa o libelosa, el reportaje o noticia publicada es ‘cierta’ por cuanto refleja la verdad de lo expresado o acontecido en el procedimiento llevado a cabo.” Villanueva v. Hernández Class, supra, a la pág. 647. Para cumplir con este requisito, basta con que se publique un extracto sustancialmente correcto. Id.
Inclusive, el privilegio del “reporte justo y verdadero” protege a quien publica una información falsa o difamatoria siempre que la misma refleje verazmente lo acontecido en los procedimientos, informes o acciones públicas u oficiales de agencias gubernamentales. No obstante, el privilegio no está presente cuando se incluye una parte parcializada y subjetiva de la historia, o cuando la información fue publicada maliciosamente con el propósito de causar daño, o si se conocía de su falsedad. Id., a la pág. 648.
En Villanueva v. Hernández Class, supra, también se reconoció la doctrina del “comentario imparcial”, como defensa a una acción por difamación. Dicha defensa procede cuando la expresión impugnada: (1) constituya una evaluación intelectual; (2) esté basada en hechos o en aquello que una persona razonable normalmente considere como hechos; (3) esté libre de cualquier imputación de motivos sórdidos o corruptos; (4) sea el resultado de una opinión honrada; (5) esté libre de malicia; y (6) esté relacionada con un asunto de interés público. Por lo contrario, no existe imparcialidad cuando: (1) la publicación incluye ataque a los motivos y al carácter de la persona no relacionados con asuntos a que se refiere el comentario o crítica; (2) discute su vida privada en relación con asuntos no relacionados al trabajo o actividad motivo de la crítica; y (3) se acusa de un crimen o se usan epítetos denigrantes o insultantes que no son necesarios para caracterizar su falta de idoneidad o su falta de cumplimiento con su deber.
Por otro lado, las doctrinas de “hipérbole retórica” y de la “opinión” fueron incorporadas a nuestro ordenamiento jurídico en Garib Bazain v. Clavell, 135 DPR 475 (1994). Según la doctrina, hipérbole retórica constituye “...una expresión alegadamente difamatoria que no es accionable si se utiliza en sentido figurativo, flexible y no necesariamente por su significado literal.” Asociación de Medicina Pediátrica v. Romero, 157 DPR 240, 246 (2002). Además, “...una expresión de opinión relativa a cuestiones de interés público que no contenga una connotación fáctica que sea susceptible de ser probada como falsa, recibirá una protección constitucional total...”. Garib Bazain v. Clavell, supra, a la pág. 489 (citando con aprobación a Milkovich v. Lorain Journal Co., 497 US 1, 20 (1990)).
Las expresiones humorísticas han sido protegidas bajo el derecho a la libertad de expresión en variadas circunstancias. “El humor, sea en forma de sátira, parodia, chistes, etc., rinde una función dual al entretener y servir de crítica social simultáneamente. Como tal, amerita una protección especial en nuestra sociedad.” (Énfasis nuestro.) Garib Bazain v. Clavell, supra, a la pág. 488.
En el caso de autos, el TPI, aceptando las recomendaciones de la Comisionada Especial, separó la publicación de la Guía del Compositor en tres secciones, a saber: (1) el resumen de la noticia sobre el caso de derechos de autor instado por Johnny Ortiz en contra de Fonovisa y otros, (2) la sección titulada Análisis que incluye dos notas, y (3) la sección titulada Premio. Establecido lo anterior, dicho foro analizó cada sección por separado y concluyó que la publicación Guía del Compositor, en su totalidad, no constituye libelo difamatorio.
*922 El tribunal recurrido determinó que la primera sección constituía un reporte justo y verdadero por ser un relato de lo que había ocurrido hasta ese momento en el referido caso de Johnny Ortiz. Dicha aseveración es correcta porque la narración expuesta en esa primera sección de la Guía del Compositor refleja sustancialmente lo acontecido en un procedimiento judicial. A pesar de que dicho reporte fue redactado como reacción a la información publicada en un periódico de circulación general y no en un informe oficial, como plantea el Ledo. Silva Almeyda, ello no presenta obstáculo alguno para configurar la defensa de “reporte justo y verdadero”. Además, no surge de los expedientes examinados que se hubiera ofrecido argumento alguno para demostrar la falsedad de lo publicado en esa primera sección. [17]
La segunda sección, según Instancia, representa un análisis del contenido de la noticia reportada por El Nuevo Día. El hermano foro de Instancia determinó que la misma constituía un comentario imparcial por ser una evaluación intelectual del Sr. Rafael Venegas sobre la manera en que los abogados de ambas partes manejaron, o debieron haber manejado, el referido caso de Johnny Ortiz.
Coincidimos con el tribunal recurrido. Más allá de constituir una evaluación intelectual de lo acontecido, dichas expresiones estaban basadas en los hechos del caso, según reportados por El Nuevo Día. Por su parte, los hechos del caso sin lugar a dudas estaban relacionados con un asunto de interés público, los derechos de autor de temas musicales de un compositor puertorriqueño muy reconocido. Por otro lado, hemos revisado el análisis efectuado por el Sr. Rafael Venegas en esta segunda sección y entendemos que la misma representa una opinión honrada y libre de malicia. Más aún, éste meramente formuló comentarios generalizados sobre los abogados de ambas partes y no mencionó al Ledo. Silva Almeyda en lo particular. [18]
Con relación a la tercera y última sección de la Guía del Compositor, el TPI determinó que la misma está cobijada por la doctrina de hipérbole retórica. Dada la importancia de las expresiones publicadas, a continuación las transcribimos nuevamente:

“Premio:

Se le otorga 1 premio caravela (sic), por impericia o chapucería (sic) legal o simplemente por perder un caso o por radicar una demanda sin fundamento a los abogados de Johnny Ortiz, Ledo. Rafael Silva Almeyda y Jesús Rabell Méndez. También (sic) por hacerle perder el tiempo y/o el dinero al compositor. ” (El original incluye una imagen de una carabela cruzada por dos huesos.) [19]
El tribunal recurrido determinó que el Premio Carabela constituye “...una sátira ingeniosa...” que utilizó el Sr. Rafael Venegas en su publicación como mecanismo literario para llamar la atención sobre la situación actual de los derechos de autor en Puerto Rico...”. [20] Ciertamente, el Premio Carabela es producto de la ficción elaborada por el Sr. Rafael Venegas para criticar las acciones de los abogados del compositor Johnny Ortiz en su pleito contra Fonovisa. Consideramos dicho mecanismo una retórica exagerada, revestida de carácter humorístico, que un lector promedió entendería que no existe en realidad. Reiteramos que las expresiones humorísticas son especialmente protegidas en nuestra sociedad, y entendemos que esta expresión particular no debe ser una excepción a esa regla.
A pesar de que esta publicación puede ser separada en tres secciones distinguibles, la Guía del Compositor constituye un solo artículo que debe ser analizado de manera íntegra. Con relación a lo aseverado, el Ledo. Silva Almeyda nos plantea que dicha publicación no puede ser considerada como un “reporte justo y verdadero” porque su última sección representa una parte parcializada y subjetiva de la historia, que fue publicada maliciosamente y con el propósito de causarle daños. No le asiste la razón. Aún considerando que la sección titulada Premio fuera una expresión parcializada y subjetiva de la historia que le precede, entendemos que la misma cumple con los requisitos de la doctrina de “hipérbole retórica”. Por ello, le conferimos a la frase “Premio Carabela” la protección total del derecho a la libre expresión.
*923 De igual manera, el tribunal recurrido determinó que la publicación ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales no constituye libelo difamatorio. Dicho foro afirmó que la mayoría de las expresiones de la página 16, titulada Espiral de demandas y mas (sic) demandas, son en su mayoría ciertas por relatar lo acontecido durante el pleito de distribución de bienes instado por la viuda del Sr. Guillermo Venegas Lloverás. De todas esas expresiones, solamente el nombre “Ratil”, seudónimo utilizado por el Sr. Rafael Venegas respecto al Ledo. Silva Almeyda, podría ser considerado como difamatorio. Empero, dicho foro encontró que el seudónimo “Ratil” está protegido por la defensa de “hipérbole retórica”. Coincidimos con tal apreciación, conforme a la norma anteriormente señalada.
La publicación ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales es un recuento de los obstáculos que los hermanos Venegas entienden que han tenido que enfrentar luego del fallecimiento de su señor padre, para proteger los derechos de autor de sus obras musicales y literarias. Este libro está compuesto por cien capítulos de los cuales solamente uno menciona indirectamente al Ledo. Silva Almeyda. El tema principal de esta publicación es lo que el autor se refiere como un gran robo. Además, el Sr. Rafael Venegas utiliza distintos seudónimos para referirse a las contrapartes verdaderas de sus personajes ficticios. [21] La misma también está revestida de elementos humorísticos, de los cuales forman parte íntegra los referidos seudónimos. [22] Igual que las expresiones publicadas en la Guía del Compositor, entendemos y resolvemos que esta sátira humorística está protegida por la doctrina de la “hipérbole retórica”.
El Ledo. Silva Almeyda también nos plantea que el tribunal recurrido incidió al catalogar al Sr. Rafael Venegas como “Prensa”, para efectos de la discusión del derecho aplicable. Sostiene que éste admitió durante la vista evidenciaría que no tenía grado ni estudio universitario alguno que lo calificara como periodista o miembro de la prensa. Dicho argumento carece de méritos, puesto que la protección de la “prensa” no descansa en estudios o títulos universitarios y tampoco cuenta con más derechos que los que tiene un ciudadano común en el ejercicio de su libertad de expresión. Oliveras v. Paniagua, supra. El estándar de adjudicación en un pleito por difamación es el mismo cuando el alegado difamador es miembro de la prensa, o si se trata de un ciudadano común.
n
El Ledo. Silva Almeyda también nos plantea que el TPI erró en la aplicación del derecho correspondiente vis-a-vis su causa de acción de interferencia culposa de tercero con obligaciones contractuales ajenas. Expone que, durante la conversación que sostuvo el Sr. Rafael Venegas con la asesora legal de WIPR, le comentó a ésta que el Ledo. Silva Almeyda era un “charlatán” y que había cometido un gran error al contratarlo. Además, el Ledo. Silva Almeyda alega que el Sr. Rafael Venegas tenía conocimiento de su relación profesional con WIPR, que dichos comentarios le causaron daños a su reputación personal y profesional, y que por su consecuencia sufrió humillación, vergüenza y temor de que su contrato fuera rescindido en cualquier momento por WIPR.
En esta jurisdicción se ha resuelto que el Art. 1802 del Código Civil de Puerto Rico, supra, permite la acción por interferencia culposa de terceros con obligaciones contractuales ajenas. Véase, Jusino Figueroa v. Walgreens, 155 DPR 560 (2001); Dolphin Int'l of P.R. v. Ryder Truck Lines, 127 DPR. 869 (1991); Gen. Office Prods. v. A.M. Capen's Sons, 115 DPR. 553 (1984). En específico, el Art. 1802 del Código Civil, supra, dispone que “[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado.”
Una acción de daños por interferencia culposa procede cuando una parte, extraña a una relación contractual, interfiere o perjudica dicha relación mediando intensión cuasidelictual. Jusino Figueroa v. Walgreens, supra. La doctrina exige que para incurrir en responsabilidad, el tercero que interfiere debe tener conocimiento de que sus acciones producirán una lesión o pérdida. [23] De igual manera, el contratante que tenía conocimiento de la interferencia culposa del tercero responderá solidariamente con éste por los daños causados. Id.
*924 Los elementos constitutivos de la acción de interferencia culposa de terceros con obligaciones contractuales ajenas son los siguientes: (1) la existencia de un contrato; (2) que medió culpa, es decir, que el tercero actuó intencionalmente, con conocimiento de la existencia del contrato y que al interferir con el mismo causaría algún perjuicio; (3) que se ocasionó un daño; y (4) que ese daño surgió como consecuencia de la interferencia culposa del tercero. Jusino Figueroa v. Walgreens, supra; Dolphin Int'l of P.R. v. Ryder Truck Lines, supra; Gen. Office Prods, v. A. M. Capen's Sons, supra.
Con relación a este último elemento, basta que el tercero hubiera provocado o contribuido a la inejecución o incumplimiento del contrato. Jusino Figueroa v. Walgreens of San Patricio, supra; Dolphin Int'l of P.R. v. Ryder Truck Lines, supra.
El TPI analizó las expresiones realizadas por el Sr. Rafael Venegas durante su conversación con la asesora legal de WIPR, Leda. Piñero, y concluyó que las mismas no estaban protegidas por las defensas de pleitos por difamación discutidas anteriormente. En su consecuencia, concluyó que el epíteto “charlatán” constituía calumnia difamatoria porque no estaba relacionado con un tema de interés público, y porque era un insulto que estaba dirigido personalmente al Ledo. Silva Almeyda, entre otras razones. Por otro lado, y luego de considerar su historial profesional, dicho foro determinó que era falso llamarle “charlatán” al licenciado.
Sin embargo, “[s]urge de la prueba presentada además, que dichas expresiones no tuvieron otras consecuencias que no fueran el daño moral causado; que la Leda. Piñero no le dio crédito a los señalamientos del Sr. Venegas Hernández; que la práctica especializada del Ledo. Silva Almeyda no se vió (sic) afectada; y que la Leda. Piñero no tendría ningún (sic) reparo en contratar nuevamente al Ledo. Silva Almeyda.” (Enfasis nuestro.) [24]
Por lo anterior, entendemos que el Ledo. Silva Almeyda no presentó suficiente evidencia ante el foro de Instancia para sostener uno de los requisitos fundamentales para la procedencia de una causa de acción de interferencia culposa de tercero con obligaciones contractuales ajenas. Específicamente, no demostró que sus alegados daños surgieron como consecuencia de la interferencia culposa del Sr. Rafael Venegas con su relación contractual con WIPR. Según el testimonio de la Leda. Piñero, las expresiones de Venegas no influenciaron de manera alguna en dicha relación contractual. Dicho testimonio fue valorado y creído por el TPI y esta Curia no tiene razón alguna para dudar de su veracidad. A falta de daño real y efectivo, no puede proceder quántum reparador.
Como se sabe, de ordinario, los foros apelativos no intervienen con la apreciación particular que hicieran los foros primarios respecto a la credibilidad de un testigo, ni de .la prueba oral presentada y admitida en un juicio. Sólo intervenimos cuando se nos demuestra que el foro primario actuó con pasión, prejuicio o parcialidad, o cometió error manifiesto en su apreciación.
ni
El Ledo. Silva Almeyda plantea que el TPI incidió al determinar que éste no probó todos los elementos de su causa de acción por persecución maliciosa. Arguye que en el caso de autos se configuraron todos los requisitos de dicha acción porque el Sr. Rafael Venegas publicó dos artículos, a los que ya hemos hecho referencia en el que le llaman “charlatán” durante una conversación con la asesora legal de WIPR y porque instó una querella de ética.profesional en su contra, y presentó una reconvención, que luego fue desestimada en Instancia.
La acción de daños por persecución maliciosa se refiere al uso injustificado de los procedimientos legales mediante la presentación, sin causa de acción probable, de un procedimiento criminal o civil contra una persona. García Pacheco v. E.L.A., 163 DPR 800 (2005). De ordinario, todo litigante ante nuestro foro judicial goza de protección o de inmunidad contra acciones de daños y perjuicios derivadas de posibles daños a *925 consecuencia de un pleito judicial. En Puerto Rico puede prosperar una acción civil de daños y perjuicios por persecución maliciosa como resultado de otro pleito, sólo como excepción a la regla general y cuando los hechos del caso evidencian circunstancias extremas en las que una parte somete a otra a un acoso de pleitos injustificados e instituidos maliciosamente con el sólo propósito de utilizar la maquinaria judicial para causar daño o estrago al adversario. Giménez Alvarez v. Silén Maldonado, 132 DPR 91 (1992); Berríos v. Int. Gen. Electric, 88 DPR 109 (1963); Oyola v. Fonseca, 77 DPR 525 (1954).
La doctrina requiere, además, que el demandante alegue y pruebe varios requisitos para prevalezca su causa de acción, a saber:

“(1) El demandante ha sido denunciado por el demandado;

(2) La causa terminó de modo favorable para el demandante;

(3) Fue seguida maliciosamente y sin que existiera causa probable;

(4) El demandante sufrió daños; y

(5) Dichos daños surgieron como consecuencia de las actuaciones del demandado. ”

Ayala v. San Juan Racing Corp., supra; Oyola v. Fonseca, supra.
Para probar el elemento de la malicia requerido por la doctrina, se tiene que establecer algo más que la mera intención del demandado de comenzar un proceso criminal o civil contra el demandante. [25] Es necesario que se determine que la acusación o causa de acción fue instada caprichosamente y sin fundamento razonable. Jiménez v. Sánchez, 76 DPR 370 (1954). Si la acción responde a una creencia razonable, no se puede imputar responsabilidad civil al demandado. Ocasio v. Alcalde Mun. de Maunabo, 121 DPR 37 (1988). La doctrina también requiere que el demandando promueva e incite activamente la iniciación del procedimiento criminal o civil, mediante actos afirmativos tales como: consejos, peticiones, estímulos o presiones. Jiménez v. Sánchez, supra. Debemos recordar que, como regla general, el remedio judicial contra las acciones civiles caprichosas e injustificadas es la imposición de honorarios de abogado e intereses por temeridad. Giménez Álvarez v. Silén Maldonado, supra.
El presente caso no es la excepción. No se encuentran aquí las “circunstancias extremas” ni el “acoso de pleitos” necesarios para concluir que la acción judicial instada por el Ledo. Silva Almeyda pueda prosperar. De sus propias alegaciones podemos concluir lo anterior. Veamos.
El Ledo. Silva Almeyda alegó en su recurso de apelación que dos de las instancias que permiten establecer que fue acosado maliciosamente lo fueron las obras publicadas por el Sr. Rafael Venegas, a saber: la Guía del Compositor y ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales. Ninguna de estas publicaciones constituye un procedimiento judicial civil o penal en su contra. Tampoco constituye un procedimiento judicial civil o penal referirse a él como un “charlatán”, durante una llamada telefónica.
Por otro lado, la reconvención instada por los hermanos Venegas en el pleito de cobro de dinero constituye un procedimiento judicial civil en su contra, y fue desestimado porque éstos no pudieron presentar suficiente evidencia para probar su reclamación de daños. [26] Sin embargo, el tribunal recurrido entendió que no era procedente una determinación de temeridad ni la imposición de honorarios de abogado en dicho caso lo que implica falta de temeridad.
Con relación a la mencionada querella sobre ética profesional, dicho procedimiento no es de naturaleza civil *926 ni penal. A pesar de que son atendidos por un foro judicial, el Tribunal Supremo de Puerto Rico, las querellas sobre ética profesional son procedimientos disciplinarios de naturaleza administrativa. En los mismos no hay partes adversas, por lo que no se puede adjudicar la victoria a alguna persona en particular. Por lo anterior, es forzoso concluir que en el presente caso no están presentes los elementos necesarios para que prospere la causa de acción por persecución maliciosa, instada por el Ledo. Silva Almeyda.
IV
Los hermanos Venegas sostienen que Instancia incidió al determinar que procedía la demanda de cobro de dinero presentada por el Ledo. Silva Almeyda, para cobrar los honorarios de abogado correspondientes al caso de distribución de bienes instado por la viuda del Sr. Guillermo Venegas Lloverás. Arguyen que, según la cláusula 4.1 del contrato de servicios profesionales suscrito por las partes, tales honorarios serían exigibles una vez finalizara el pleito y éstos cobraran la remuneración correspondiente por los derechos de autor de las canciones de su padre. Que por ello, dicha cláusula establece una garantía de pago sujeta a que los hermanos Venegas fueran declarados dueños de la referida propiedad intelectual.
Alegan, además, que aquel pleito no ha finalizado porque éstos no han tomado posesión de los derechos de autor de la música del Sr. Guillermo Venegas Lloverás libre de gravámenes, ya que la misma está inscrita a favor de ACEMLA. Los hermanos Venegas arguyen que las gestiones encomendadas al Ledo. Silva Almeyda aún no se han realizado y que su renuncia en aquel caso provocó la dilación de los procedimientos. No les asiste la razón.
Como se sabe, las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes. Art. 1044 del Código Civil, 31 LPRA see. 2994. Los contratos se perfeccionan por el mero consentimiento y desde ese momento las partes se obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que, según la naturaleza del acuerdo, se conformen a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 LPRA see. 3375.
A tenor del principio de la autonomía de la voluntad, reconocido en dicho cuerpo legal, las partes pueden convenir las cláusulas y condiciones que les convengan, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. Art. 1207 del Código Civil, 31 LPRA see. 3372. Véase, además, Álvarez de Choudéns v. Rivera Vázquez, 165 DPR 1 (2005); Irizarry López v. García Cámara, 155 DPR 713 (2001). Una vez las partes perfeccionan el contrato, como regla general, pueden pautar el contenido y alcance de esa relación jurídica sin otra intromisión del Estado que la impuesta por los estatutos descritos.
Con relación a la demanda de cobro de dinero de autos, el Tribunal Supremo ha reiterado que “[e]l demandante sólo tiene que probar que existe una deuda válida, que la misma no se ha pagado, que él es el acreedor y los demandados sus deudores.” General Electric v. Concessionaires, Inc., 118 DPR 32, 43 (1986). Véase, además, Art. 1168 del Código Civil, 31 LPRA see. 3261. Al examinar los autos del presente caso, no albergamos duda alguna de que el Ledo. Silva Almeyda logró cumplir con dichos requisitos.
El TPI determinó que la cláusula 4.3 del contrato de servicios profesionales suscrito por las partes permitía al Ledo. Silva Almeyda presentar su renuncia en cualquier momento y cobrar la tarifa de $75.00 por cada hora de trabajo realizado hasta ese momento. Dicho acuerdo procedía siempre y cuando los hermanos Venegas incumplieran con su obligación de encontrarse “...disponible y accesible a fácil comunicación mientras dure el presente litigio y se compromete a ofrecer siempre información fidedigna y completa [al Ledo. Silva Almeyda] según sea requerida...”. [27] Aún más, el tribunal recurrido determinó que el Ledo. Silva Almeyda presentó suficiente evidencia para probar que no existía comunicación efectiva y eficiente entre abogado y cliente, porque los hermanos Venegas no entendían ni aceptaban sus estrategias. El Ledo. Silva Almeyda también probó que éstos ignoraban sus consejos y desconfiaban en su representación legal.
*927 Sin lugar a dudas, en el presente caso existe una deuda válida relacionada con los honorarios por servicios profesionales que no ha recibido el Ledo. Silva Almeyda por el trabajo que realizó para los hermanos Venegas. Dicha deuda no fue satisfecha por éstos porque insisten que la misma no es exigible en este momento. Entendemos, al igual que el foro de Instancia, que la cláusula 4.3 del contrato de servicios profesionales permite al Ledo. Silva Almeyda renunciar a la representación legal convenida si sus clientes incumplían con su deber de comunicación efectiva. Entendemos y resolvemos que, según la prueba examinada, el Ledo. Silva Almeyda probó que los hermanos Venegas incumplieron con dicha obligación. Tal circunstancia activó la prestación específica de la cláusula 4.3 del contrato y lo convirtió en acreedor de lo allí pactado.
Por otro lado, los hermanos Venegas plantean que dicho foro incidió al desestimar su reconvención de daños por impericia profesional. Éstos alegaron que, como consecuencia de su renuncia, el Ledo. Silva Almeyda era responsable de que no disfrutaran de los derechos de autor de la música de su fenecido padre.
Sin embargo, el TPI escuchó y valoró sus testimonios y determinó que el Ledo. Silva Almeyda no era responsable de la explotación de la música del Sr. Guillermo Venegas Lloverás, porque tal situación ha sido litigada desde el 1999, fecha en que el letrado renunció a la representación legal, hasta el presente. Además, porque los hermanos Venegas han contratado posteriormente varios representantes legales que han trabajado el referido caso y el mismo continúa en los tribunales. Finalmente, el tribunal recurrido determinó que la prueba presentada ante su consideración no justifica la compensación en daños.
Resolvemos que los hermanos Venegas no establecieron ante el TPI que el Ledo. Silva Almeyda es responsable de todos los incidentes imputados. Además, éstos no presentaron argumentación alguna que nos persuada para interferir con la valoración efectuada al respecto por el tribual recurrido de la prueba presentada durante el juicio en su fondo. Por ello, el hermano foro de Instancia no cometió los errores aquí levantados.
V
En el caso de autos, ambas partes nos plantean que el tribunal recurrido erró al no fijar cantidad alguna por concepto de costas y gastos del litigio en los pleitos consolidados sobre difamación, interferencia culposa, y persecución maliciosa “.. .por tratarse de planteamientos novedosos y cuestiones de derecho legítimas.” [28]
La Regla 44.1(a) de Procedimiento Civil, 32 LPRA Ap. Ill, R. 44.1(a), dispone que el tribunal ordenará a la parte que no haya prevalecido a pagar aquellas costas y gastos incurridos necesariamente por la parte victoriosa en la tramitación del pleito. Además, el tribunal podrá conceder discrecionalmente la cantidad de costas que determine que un litigante debe rembolsar a otro.
Como regla general, no constituyen costas del litigio los gastos ordinarios de las oficinas de los abogados. Dichos gastos ordinarios incluyen sellos de correo, materiales de oficina y transcripciones de vistas cuando se solicitan por ser convenientes, pero no son necesarias para la tramitación de pleito. Tampoco son reembolsables como costas, los gastos por el uso de mensajeros, teléfonos, servicios de fotocopia y gastos de oficina de similar naturaleza, en ausencia de una demostración de alguna necesidad especial relacionada con una gestión particular del caso. A pesar de que los gastos generales de oficina son necesarios para el ejercicio de la abogacía, los mismos no son reembolsables como costas. Andino Nieves v. A.A.A., 123 DPR 712 (1989).
Atendidos los planteamientos de las partes y considerando que el Ledo. Silva Almeyda no surgió victorioso en alguna de las causas de acción presentadas en los referidos pleitos consolidados, concluimos que el tribunal recurrido erró al no adjudicar las costas y gastos de los pleitos KPE2004-0157 y KDP2005-0633 (consolidados) a favor de los hermanos Venegas, por lo que en tales expedientes imponemos a favor de los hermanos Venegas las costas del litigio. Regla 44.2 de Procedimiento Civil, 32 LPRA Ap. Ill, R. 44.2; Ferrer Delgado v. Tribunal Superior, 101 DPR 516 (1973).
*928 VI
Finalmente, nos corresponde atender la procedencia de la imposición de daños en los casos KPE2004-0157 y KDP2005-0633 (consolidados). En los mismos, la Comisionada Especial recomendó al tribunal recurrido que ordenara al Sr. Rafael Venegas pagarle al Ledo. Silva Almeyda $8,000.00 en concepto de daños al honor y reputación del demandante y por sus angustias emocionales. Dicho foro acogió la recomendación, pero aumentó la suma a $10,000.00. Entendemos que no procede la imposición de suma alguna por concepto de daños en los referidos pleitos.
La propia Comisionada Especial estableció en su informe, que luego fue adoptado en su totalidad por el tribunal recurrido, que “...no proceden las demandas instadas en el presente caso en cuanto a las acciones por interferencia torticera y persecución maliciosa. Tampoco procede la acción por libelo en cuanto a lo expresado en la ‘Guía del Compositor’ y ‘¿Quién escribió Borracho Sentimental?’, por tratarse de expresiones cobijadas por el ‘privilegio del informe justo e imparcial’ o por las defensas del ‘comentario imparcial’ y la ‘hipérbole retórica’. En cuanto a la acción por difamación a raíz de las expresiones hechas por el Sr. Venegas Hernández a la Leda. Piñero, procede la demanda, en tanto las expresiones son constitutivas de calumnia, según contempladas en la Ley de Libelo y Calumnia, ante, y nuestra jurisprudencia.”
Debemos señalar nuevamente que en las acciones por difamación, ya sea por libelo o por calumnia, sólo procede la compensación por los daños a la reputación y buen nombre del perjudicado, y no la indemnización por las angustias mentales provocadas por la publicación de la información. Sociedad de Gananciales v. El Vocero de Puerto Rico, Inc., supra; Porto v. Bentley Puerto Rico, supra.
Con relación a las expresiones formuladas por el Sr. Rafael Venegas durante la llamada telefónica que sostuvo con la asesora legal de WIPR, la Comisionada Especial determinó que las mismas “...no tuvieron otras consecuencias que no fueran el daño moral causado [y] que la práctica especializada del Ledo. Silva Almeyda no se vió (sic) afectada...”. (Énfasis nuestro.) [29] Por lo contrario, el Ledo. Silva Almeyda testificó que continuó consiguiendo clientes como de costumbre después de las referidas expresiones difamatorias. La relación profesional entre el Ledo. Silva Almeyda y WIPR no quedó afectada por tal conversación.
Conforme a lo señalado, y por entender que el Ledo. Silva Almeyda no sufrió daño alguno a su reputación profesional y que no proceden los daños emocionales como compensación en pleitos por difamación, revocamos la imposición de daños efectuada por el tribunal recurrido.
Dictamen
Por los fundamentos antes expuestos, confirmamos la Sentencia apelada, salvo que revocamos la imposición de daños efectuada por el TPI en los casos K PE2004-0157 y K DP2005-0633 (consolidados). Procede la imposición de las costas a favor de los hermanos Venegas en las causas K PE2004-0157 y K DP2005-0633.
Lo acordó y manda el Tribunal y lo certifica la Secretaria.
Leda. Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2010 DTA 36

. Los nombres de los codemandados son como sigue: Rafael, Guillermo y María del Carmen, todos de apellidos Venegas Hernández, y Yeramar Venegas Velázquez.

. Contrato de Servicios Profesionales: Representación Legal, Cláusula 4.1, pág. 56 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Véase, Contrato de Servicios Profesionales: Representación Legal, Cláusula 4.3, pág. 57 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Dicha determinación fue posteriormente confirmada por este Tribunal mediante una Resolución emitida por el panel integrado por su presidenta, la Juez Pesante Martínez, y los Jueces Martínez Torres y Salas Soler el 28 de enero de 2000 en la causa KLCE-1999-01206.

. No obstante, la demanda continuó pendiente de resolución en rebeldía contra las codemandadas Distribuidora Nacional y Distribuidora Aponte.

. Esta historia fue publicada el 23 de junio de 2000 en la Guía del Compositor, http://usuarios.lvcos.es/rvenegas/noticias4. htm?. Al presente, y como consecuencia de una de las demandas que se encuentran ante nuestra consideración, dicha historia fue removida del Internet por su dueño, el Sr. Rafael Venegas.

. Véase, Guía del Compositor: Demanda de Johnny Ortiz por $6 millones contra Fonovisa no prospera, pero pendiente contra Distribuidora Aponte, págs. 45-46 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Véase, Informe Final y Recomendaciones de la Comisionada Especial Designada, pág. 132 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Véase, Informe Final y Recomendaciones de la Comisionada Especial Designada, págs. 133-134 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Véase, ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales, pág. 16 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Sentencia (K PE2004-0157 y K DP2005-0633, consolidados), pág. 175 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. C. Irizarry Yunqué, Responsabilidad Civil Extracontractual: Un estudio basado en las decisiones del Tribunal Supremo de Puerto Rico, 3ra ed., San Juan, 1998, pág. 94.

. Véase, Romany v. El Mundo, Inc., 89 DPR 604 (1963).

. “El Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna, o que prohíba el libre ejercicio de la misma o que coarte la libertad de palabra o de prensa; o el derecho del pueblo a reunirse pacíficamente y a solicitar del Gobierno la reparación de agravios.”

. No surge de los expedientes ante nuestra consideración que los hermanos Venegas hayan convencido al TPI de que el Ledo. Silva Almeyda es una figura pública según los criterios establecidos en Garib Bazain v. Clavell, 135 DPR 475 (1994), y González Martínez v. López, 118 DPR 190 (1987), entre otros. Dichos criterios son los siguientes: (l) la prominencia en los asuntos de la sociedad, (2) la capacidad para ejercer influencia y persuasión en la discusión de los asuntos de interés público, y (3) la participación activa en la discusión de controversias públicas específicas con el propósito de inclinar la balanza en la resolución de las cuestiones involucradas.

. El concepto de negligencia se define según el ámbito reconocido en el campo de la responsabilidad extracontractual. Véase, Ojeda v. El Vocero, 137 DPR 315 (1994); Villanueva v. Hernández Class, 128 DPR 618 (1991).

. Debemos señalar que solamente se menciona al Ledo. Silva Almeyda en esta primera sección de la Guía del Compositor para aclarar que éste fungió como uno de los abogados que representó al compositor Johnny Ortiz en el referido caso contra Fonovisa y otros. Es forzoso concluir que dichas expresiones no pueden ser consideradas como difamatorias según la doctrina discutida.

. La primera Nota contenida en la segunda sección de la Guía del Compositor hace referencia directa al Ledo. Alfredo Castellanos. No obstante, dicho letrado no funge como parte en el presente caso.

. Véase, Guía del Compositor: Demanda de Johnny Ortiz por $6 millones contra Fonovisa no prospera, pero pendiente contra Distribuidora Aponte, pág. 46 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Informe Final y Recomendaciones de la Comisionada Especial Designada, pág. 161 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Por ejemplo, el señor Rafael Venegas utiliza el apodo “ACEROBA” (leído de la siguiente manera: “A se roba”) para referirse a la Asociación de Compositores y Editores de Música Latinoamericana (ACEMLA). Véase, ¿Quién escribió Borracho Sentimental? y otros escándalos en los tribunales, pág. 5 del Apéndice del recurso de Apelación del caso KLAN-2008-00421. Además, utiliza el seudónimo “JaFraud” para referirse al ex magistrado federal Jesús A. Castellanos. Op. cit., a la pág. 27.

. La Comisionada Especial señaló en su informe que “...surge de los testimonios del Ledo. Ángel Caro y el Sr.. Luis Rabel, que éstos leyeron el libro en cuestión y que ‘lo tomaron a broma’. Incluso, el propio Ledo. Caro, tomó a broma la referencia que se hace en el libro a su persona, llamándole ‘Expensive’...”. Informe Final y Recomendaciones de la Comisionada Especial Designada, pág. 165, n. 18, del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. L. Diez-Picazo y A. Guitón, Sistema de Derecho Civil, 3ra ed., Madrid, Ed. Tecnos, Vol. II, 1982, pág. 109.

. Informe Final y Recomendaciones de la Comisionada Especial Designada, pág. 171 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Herminio M. Brau del Toro, Los Daños y Perjuicios Extracontractuales en Puerto Rico, San Juan, Publicaciones J.T.S., 1986, pág. 112.

. Discutiremos dicha causa de acción, y los señalamientos de error imputados por los hermanos Venegas, con mayores detalles en la sección IV de esta Sentencia.

. Véase, Contrato de Servicios Profesionales: Representación Legal, Cláusula 3.5, pág. 56 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Sentencia (K PE2004-0157 y K DP2005-0633, consolidados), pág. 176 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.

. Informe Final y Recomendaciones de la Comisionada Especial Designada, pág. 171 del Apéndice del recurso de Apelación del caso KLAN-2008-00421.